**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 18 CR 734-1** |
| | ) | |
| **TERRY FERGUSON** | ) | |

**MEMORANDUM OPINION AND ORDER**

MATTHEW F. KENNELLY, District Judge:

Defendant Terry Ferguson, who is charged with narcotics offenses, has moved to exclude evidence that was obtained as the result of a search of his home and vehicle. The Court previously made an oral ruling, which it incorporates in full, and memorializes the ruling in writing in this memorandum opinion.

Just before 6:00 a.m. on October 30, 2018, law enforcement agents went to the home of Terry Ferguson and his family in Willowbrook, Illinois. They were armed with a warrant for Ferguson's arrest on a charge of conspiracy to distribute narcotics that had been filed on October 29. The agents also had a warrant, also issued on October 29, authorizing them to seize and search Ferguson's cellular phone. What they did not have was a warrant to search his home. An application for such a warrant was in the works, but it had not yet been filed.

Over twenty ATF agents and Illinois State Police officers arrived at Ferguson's home to execute the arrest warrant. The events can be described with considerable precision because, unbeknownst to the agents at the time, they were being video-recorded on cameras inside Ferguson's home.

The agents knocked on the front door at 5:59 a.m. Ferguson's minor daughter

answered. Agents pulled her outside and entered the home *en masse.* They encountered Ferguson immediately after entering and took him custody by no later than 6:00:33 a.m. He was taken out of the house just before 6:07 a.m.

The agents conducted what the government contends was a "protective sweep" of the home. Rather than using euphemisms, the Court will summarize what the video shows. The agents went upstairs, entered Ferguson's bedroom, and looked around. Then they kicked in the door of another upstairs bedroom, where Ferguson's son and grandson were sleeping. Then they returned to Ferguson's bedroom—even though they had already ascertained it was clear. They also went into the basement, where they found another of Ferguson's sons who had been sleeping there.

By no later than 6:04 a.m., the agents had gone through the entire home, and all of the home's occupants had been located and brought to the main floor. The agents, however, did not stop there. After securing all of the occupants, they returned to the basement for several minutes; they went into the garage and looked around, in particular conducting an extended examination of a riding lawnmower; they returned again to Ferguson's upstairs bedroom and looked around for a third time; they returned to, and searched in, the other upstairs bedrooms that they had entered previously; and they returned yet again to Ferguson's bedroom and continued to look around. Evidently not satisfied, the agents went back into Ferguson's bedroom three more times after this: an hour later, about 7:25 a.m.; again a little before 7:45 a.m.; and again at 9:12 a.m., when the primary ATF case agent, Chris Labno, entered Ferguson's bedroom and looked around for about three and one-half minutes.

Meanwhile, Ferguson had been taken from the property just after 6:00 a.m.,

2

within a few minutes after he was taken into custody.  His wife, Cherie Ferguson,

remained in the home on the ground floor, as did the home's other occupants.  Agents

contend that Ms. Ferguson was told at the outset that she could leave if she wanted.

Ms. Ferguson squarely denies this; she states that she was told she had to sit at a table

and not move and that she was told she had to remain there to be interviewed by a

particular agent, who did not arrive until 8:00 a.m.  *See* dkt. no. 186.  Ferguson's son

Trace Ferguson also states that they were told to sit and not move and that his mother

was told she could not leave and had to remain there to speak to a particular agent.

*See* dkt. no. 187.

At one point while Ms. Ferguson was waiting for the other agent to arrive, she

went upstairs with two agents and retrieved Ferguson's cellular phone.  Ms. Ferguson

states that this was a result of "the agents directing me to go and get them my

husband's phone."  Dkt. no. 186.  The agents say in their report that earlier, after they

told Mr. Ferguson they had "a search warrant for [his] cellular telephone," dkt. no. 161-1

at 3, he told them it was on or next to his bed.  Later, the agents say, an agent told Ms.

Ferguson about the warrant and what her husband had said about the phone, and

"[a]gents then followed [Ms. Ferguson] as she went upstairs to the bedroom that Terry

sleeps in and pointed out [his] cellular telephone."  *Id.* at 4.  That is not quite accurate.

What the video shows is that Ms. Ferguson went upstairs sandwiched between two

agents—one in front of her and one behind; they entered the bedroom; and Ms.

Ferguson retrieved a phone and gave it to the agents.  Moreover, as indicated earlier,

Ms. Ferguson maintains that the agents *directed* her to get the phone and that this was

not the consensual event suggested by the agents' narrative in their report.

3

In the meantime, attention was also focused on a GMC truck parked in the driveway of the home. In agent Labno's report summarizing the events of October 30, prepared a little under three weeks later, he describes the events thusly:

> . . . Cherie Ferguson advised that she had been prescribed hydrocodone "Norco" painkillers after a past surgery . . . and [ ] kept her pill bottle in their black GMC truck. . . . S/As Labno and Burney asked Cherie Ferguson if she would consent to a search of the black GMC truck and Agents could look for her pills. Agents explained that Cherie Ferguson had every right to refuse to consent to this search and require Agents to seek a search warrant. Cherie Ferguson stated that she understood this and was willing to still consent to a search. S/A Burney then provided her with ATF Form 3220.11, Consent to Search Form. S/A Burney then read this form to Cherie Ferguson, explaining each right concerning a consent search—especially the fact that Cherie Ferguson had every right to refuse to allow Agents to search the black GMC Denali. Cheri Ferguson explained that she understood her rights and was willing to waive them and allow Agents to search the truck. Cherie Ferguson then signed this form to memorialize her understanding of her rights as well as her willingness to agree to a consent search. S/As Labno and Burney then signed this form as witnesses.
>
> Cherie Ferguson then retrieved her keys and opened the truck for Agents. Agents then conduced a systematic search of the truck and recovered the following pieces of evidence: Numerous miscellaneous documents of indicia [sic], (1) black wallet, (3) belts, $1550 in cash, (4) separate checks totaling $3550, (5) watches, and $950 in suspected counterfeit currency.

Dkt. no. 161-1 at 5.

In short, according to the agents, things happened in the following sequence: (1) they asked if Ms. Ferguson would consent to a search of the truck and explained she could refuse; (2) Ms. Ferguson agreed to a search; (3) agents "then" provided her with a consent form, read it out loud, and again explained that she had a right to refuse; (4) Ms. Ferguson "then" signed the form; (5) the agents "then" signed it as witnesses; (6) Ms. Ferguson "then" got her keys and opened the truck; and (7) the agents "then" conducted a search of the truck and recovered various items.

4

That's not what actually happened. Although the security-camera video does not include sound, the actual sequence of events is more or less the opposite of what the agents describe in their report. In particular, the consent form was not brought out until the end of the process, after the agents had finished searching the truck. More specifically, the video reflects that agents and Ms. Ferguson went to the truck; no forms or documents were shown or signed; Ms. Ferguson went in through the passenger side, presumably to retrieve her pills; the agents went into the driver's side at essentially the same time; and the agents remained in the car, searching it, for some period. It was only *after this* that an agent produced what appears to be a clipboard with a document on it, which Ms. Ferguson signed on the hood of the truck.

It is readily apparent from the video alone that the agents' report does not get it right regarding the search of the truck. In the report, the agents claim they had both verbal and written consent to a search of the truck before it was conducted. The latter contention is plainly wrong. And the former contention is suspect, given the falsity of the agents' written account of the sequence of events and Ms. Ferguson's contention that she was not free to leave—i.e. that she was in custody. *See, e.g., United States v. Grap*, 403 F.3d 439, 443 (7th Cir. 2005); *see generally Schneckloth v. Bustamonte*, 42 U.S. 28, 248-48 (1973) (voluntariness of consent is based on totality of circumstances, including whether party is in custody).

Were the government intending to use evidence obtained from the truck, the Court would need to conduct a hearing to determine whether the search was conducted pursuant to voluntary consent. At argument on the motion, however, the government disavowed any intention to use against Ferguson any evidence obtained as a result of

the search of the truck.  For that reason, the parties' factual dispute is immaterial to the

Court's determination of the motion to suppress.[1]

As far as the seizure of the phone is concerned, the agents had a warrant that

authorized them to do that.  What they did not have at the time was a warrant that

authorized them to search the home to find the phone.  This quite plainly did not deter

them from searching the home anyway.  Ferguson contends this continued searching

violated the Fourth Amendment.

The government maintains that what the agents did amounted to an authorized

protective sweep, but that contention is not sustainable based on the video evidence.

Backing up a few steps, the agents were unquestionably authorized to enter Ferguson's

home to effectuate the arrest warrant.  *Payton v. New York*, 445 U.S. 573, 602-03

(1980).  But the arrest warrant did not authorize law enforcement to conduct a general

search of Ferguson's home.  *See Steagald v. United States*, 451 U.S. 204, 213 (1981).

A warrantless search of a home—which is what the video shows the agents did—is

unconstitutional unless it is justified by exigent circumstances or some other exception

to the Fourth Amendment's warrant requirement.  *See, e.g., Groh v. Ramirez*, 540 U.S.

551, 559 (2004); *Payton*, 445 U.S. at 586.

In this case there were no exigent circumstances authorizing a search of

Ferguson's home.  Instead the government relies on the "protective sweep" rule

established in *Maryland v. Buie*, 494 U.S. 325 (1990).  Under this rule, law enforcement

officers conducting a lawful arrest inside a home may, "as a precautionary matter and

---

[1] The government similarly disavowed any use at trial of evidence regarding the riding lawnmower that the investigating agents examined when they searched Ferguson's garage.  Apparently the lawnmower is claimed to have been stolen in Wisconsin.

without probable cause or reasonable suspicion, look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched." *Id.* at 334. But this does not authorize "a full-blown search of the entire house for evidence of the crime for which the arrest was made," *id.* at 335; it was on that basis that the Court in *Buie* distinguished *Chimel v. California*, 395 U.S. 752 (1969), which limited a search incident to an in-home arrest under a warrant to "the arrestee's person and the area from within which the arrestee might have obtained a weapon." *Buie*, 494 U.S. at 336. Rather, what the Fourth Amendment permits is "a properly limited protective sweep in conjunction with an in-home arrest when the searching officer possesses a reasonable belief based on specific and articulable facts that the area to be swept harbors an individual posing a danger to those on the arrest scene." *Id.* at 337.

Even if *Buie* had authorized the agents to conduct a "sweep" of the entire house and garage even after they quickly removed Ferguson from the premises and put him in a police vehicle a few minutes after their entry into the home (Ferguson argues otherwise), it in no way authorized them to continue to search the house—including repeatedly searching Ferguson's bedroom—after they had secured the premises. *See id.* at 335-36 (protective sweep may last "no longer than is necessary to dispel the reasonable suspicion of danger.") And even though the agents were permitted to secure the premises while awaiting the search warrant that, by that point, had been or was about to be applied for, *see Segura v. United States*, 468 U.S. 796, 810 (1984); *United States v. Etchin*, 614 F.3d 726, 734 (7th Cir. 2010), that did not authorize them to do any searching of Ferguson's home in the expectation that a warrant was

7

forthcoming.

That said, however, the agents did not acquire Ferguson's cellular phone via their impermissible continued searching of his home after completing the protective sweep. Nor did they acquire in that way any other evidence that they intend to use against Ferguson at trial. Rather, the agents evidently acquired the phone via Ms. Ferguson after they either asked her or told her to go get it. There is a factual dispute over whether her retrieval of the phone was voluntary or compelled. Ferguson contends it was compelled, and the video evidence as well as Ms. Ferguson's statement tend to support this: she says she was not permitted to leave, with as many as two dozen agents swarming around the home—which would mean she was detained or in custody; she says she was *directed* to go get the phone; the video evidence reflects that she was effectively led upstairs by the agents to get it; and the agents' description in their report of how they went upstairs misstates what the video evidence shows.

Again, however, this dispute is not material to resolution of Ferguson's motion to suppress. The reason is the "inevitable discovery" doctrine, which "allows for the admission of evidence that would have been discovered even without the unconstitutional source." *Utah v. Strieff*, 136 S. Ct. 2056, 2061 (2016). In this case, the search warrant later obtained for Ferguson's home was "untainted by the initial illegality." *Murray v United States*, 487 U.S. 533, 537 (1988). When the agents impermissibly exceeded the proper scope of a protective sweep and conducted a general and warrantless search of Ferguson's home, and when they allegedly compelled Ms. Ferguson to retrieve Ferguson's cellular phone, the following state of affairs existed:

- the agents already had a warrant to seize the phone and search it;

- the process of obtaining of a warrant to search the home was already underway;

- the application to obtain that warrant was not based on anything obtained from the agents' inappropriate searching of the home or the GMC truck;

- once they had the warrant, which a magistrate judge issued only a few hours after Ferguson's arrest, the agents would have been authorized to go into the home and search to the extent needed to find the phone; and

- the Court has to take as a given that the phone would have still been there if the agents had left and then returned after they got the warrant. The possibility that someone could have disposed of it in the meantime does not entitle Ferguson to suppression of the phone from evidence. *See Segura*, 468 U.S. at 816; *United States v. Blackwell*, 416 F.3d 631, 633 (7th Cir. 2005).

This is sufficient to show that the inevitable discovery doctrine saves the admissibility of the cellular phone and its contents despite the agents' inappropriate conduct. Ferguson says that the agents exploited their presence in the home while awaiting the search warrant and argues, citing *United States v. Madrid*, 152 F.3d 1034, 1041 (8th Cir. 1998), that the flagrancy of their misconduct should preclude application of the inevitable discovery doctrine. The Seventh Circuit, however, has rejected *Madrid* in this regard, *see United States v. Huskisson*, 926 F.3d 369, 374 n.2 (7th Cir. 2019), and that decision is binding on this Court.

## Conclusion

For these reasons, the Court concludes that the factual disputes raised by Ferguson are immaterial to the motion to suppress. Because the government has

9

disavowed usage of anything obtained via the search of Ferguson's GMC truck (as well as the riding lawnmower), and because the inevitable discovery doctrine precludes suppression of evidence obtained via the agents' impermissible searching of Ferguson's home or their seizure of his cellular phone, the Court denies his motion to suppress [dkt. no. 161].  The Clerk is also directed to terminate Ferguson's motion to modify conditions [dkt. no. 218] without prejudice as moot.

Date:  January 19, 2021

_____

MATTHEW F. KENNELLY
United States District Judge