**U.S. Department of Justice**
Bureau of Alcohol, Tobacco, Firearms and Explosives

# Report of Investigation

| Title of Investigation: | Investigation Number: | Report Number: |
|---|---|---|
| Operation Sheriff of Nottingham | 772010-16-0005 | 77 |

## SUMMARY OF EVENT

Undercover meeting with Terry FERGUSON.

## NARRATIVE:

1. **UNDERCOVER CONTACT:** On October 17, 2016, at approximately 1241 hours, ATF Special Agents (S/A) Christopher J. Labno, acting in an undercover capacity, met with Terry FERGUSON, white male, DOB: 05/26/1964, FBI#: 925984AA1, SID#:IL23409850 and had a recorded conversation regarding FERGUSON's cocaine trafficking and money laundering activities.

2. S/A Labno should note that this undercover meeting was previously arranged through recorded telephone calls and text messages between S/A Labno and FERGUSON which are documented in a separate Report of Investigation (ROI). Prior to this undercover contact, S/A Labno was equipped with a disguised audio and video recording devices as well as an electronic transmitter. This report is based upon Agent's observations as well as a review of the electronic surveillance evidence associated with this transaction.

3. On this same date, at approximately 1239 hours, S/A Labno drove eastbound on 72nd Street Chicago, Illinois. S/A Labno then continued driving through the Nottingham Park area, driving south on Sayre and then westbound on 73rd Place. S/A Labno then parked his undercover vehicle in front of 7028 W. 73rd Place, Chicago, Illinois. S/A Labno observed that FERGUSON was already at this location and had backed in his grey Ford F150 bearing Illinois license plate 1423262B into the driveway of this vehicle.

4. S/A Labno then exited the vehicle and walked to FERGUSON and had a brief conversation. Specifically, FERGUSON advised that he had hurt his back. S/A Labno and FERGUSON then discussed FERGUSON's health and then the conversation then turned to a cocaine for cigarettes transaction. S/A Labno advised FERGUSON that he was interested in trading cigarettes for a kilogram of cocaine, a "whole one." FERGUSON then replied that S/A Labno should stick to nine hundred grams for nine hundred cartons of cigarettes as no one wanted to sell a whole kilogram. Specifically, FERGUSON stated, "Don't even. Go nine for nine. Nobody wants to do nothing for whole things (kilograms)." FERGUSON then told S/A Labno, "We'll work out the logistics. What's the price on the cartons?" S/A Labno advised that he could trade Newport cigarette cartons for $50-$45.00 a carton. FERGUSON replied, "That's not really a player price. In Indiana where I got my

| Prepared by: Christopher J. Labno | Title: Special Agent, Chicago I Field Office | Signature: | Date: 12.27.16 |
|---|---|---|---|
| Authorized by: Bernard G. Hansen | Title: Group Supervisor, Chicago I Field Office | Signature: | Date: 12-30-16 |
| Second level reviewer (optional): Jeffery A. Magee | Title: Special Agent in Charge, Chicago Field Division | Signature: | Date: |

ATF EF 3120.2 (10-2004)
For Official Use Only

properties, from Pilot, that truck stop, I get 'em from the manager, I get them for $44.00 bucks out the door."

5. FERGUSON then asked S/A Labno, "Listen, maybe you can help me with something too. I got forty five of these brand new in boxes." FERGUSON then showed S/A Labno a photograph of a Frigidaire stove from the Frigidaire website on his cellular telephone. FERGUSON continued, "Frigidaire stoves, I got forty-five of them bro. I'll take one hundred bucks a piece. They're $468.00 in the store." FERGUSON then detailed the models he had and where he had them. "Stainless steel, black and white. I got 'em in a garage right here. I got forty-five of them." S/A Labno asked FERGUSON how he had gotten stuck with all of the stoves and FERGUSON replied; "What happened was I bought the whole load 'cause I wanted the washer and dryers. So now I got forty-five stoves and I'm blowing them off for cheap. You're a hustler. You should be able to get them off."

6. S/A Labno should note that based upon the previous receipt of criminal intelligence he was aware that a tractor trailer theft of Frigidaire appliances had been stolen from Bolingbrook, Illinois on April 10, 2016. This theft was reported in Bolingbrook Police Report # LB2160410002072.

7. The conversation then turned back to contraband cigarettes. Specifically, FERGUSON stated, "I want to stick around where Jessie was at [approximately 600 grams]." FERGUSON continued, "There's nothing we can't get through. I see you once in a while. We both know what we need to do—we don't even need to talk. Once you're there, you call me and we'll work everything out tight then and there." S/A Labno asked how much lead time FERGUSON would need and FERGUSON told S/A Labno, "at least give me a day."

8. S/A Labno and FERGUSON then discussed real estate with S/A Labno telling FERGUSON that he (S/A Labno) wanted FERGUSON to mentor him on how to use his (S/A Labno's) money to buy legitimate real estate investments. FERGUSON told S/A Labno, "Bro, I got a bad ass little house in Indiana right by Burr and 80. Little brick house, two bedroom—all brand new. I could sell it at a good price and I own the house next door too." S/A Labno advised FERGUSON that he was concerned with showing the origin of his (S/A Labno's) money which he (S/A Labno) would use to buy the house. FERGUSON explained, "You really don't need records when you buy. You need records when you sell." FERGUSON continued, "I just paid two hundred sixty thousand dollars for a house. I wired the money and nobody asked where the money came from. When you go to sell, that's when they want the tax money. How much did you pay? How much did you gain? How much did you put in it? That's when the questions are asked." S/A Labno advised that he might just rent out the house to make money. FERGUSON responded, "That's where it's at! That's what I do."

9. FERGUSON then pointed out a house down the block and advised "Around here, I'll get one of those houses like that for ninety thousand and then [charge] $1,500.00 a month. I got one right here, two on the next block. Indiana, I'll pay fifteen, twenty for it [15,000.00-20,000.00] put thirty into it and I'll still get $850 a month. S/A Labno advised that he was interested in avoiding banks and taxes and wanted to buy real estate. FERGUSON advised, "Say I got a house for sale. I want sixty-five thousand dollars and you come to me and say, 'Terry, I'll give you thirty-five thousand in cash and we'll only show that I paid twenty-five thousand.'" S/A Labno asked if this was hard to do and FERGUSON replied, "No, I did it with one over here. We said hey can I give you thirty thousand dollars cash on the side and just say we paid fifty thousand. That's all we show."

10. FERGUSON returned to the house in Indiana which he was selling and advised, "I'll take sixty thousand for it, but it's bad ass though." FERGUSON then showed S/A Labno his cellular telephone, first playing a brief video of an industrial property saying "That's my warehouse," and then showing several photographs of a small brick residence which FERGUSON advised was the house he had for sale in Indiana. FERGUSON stated, "It's simple bro, when you're ready just let me know and we'll go find you one. Once you do one it's like riding a

bike." FERGUSON then discussed how easy it was to avoid paying taxes on real estate purchases in Indiana as he could go to the court house and register the quit-claim deed on his own. FERGUSON advised, "You can say he bought it off of me for twelve thousand." S/A Labno then asked if this was how the transaction would work if he bought the house in Indiana which FERGUSON currently had for sale. S/A Labno asked, "So, if we did that and I bought it off of you for sixty we would say I bought it from you for thirty?" FERGUSON responded, "No, twenty! Exactly, and quit claimed over to you and it's yours the same day."

11. The conversation then turned to firearms. Specifically, S/A Labno advised that several of DOMINGUEZ's "guys" were calling S/A Labno to conduct business. FERGUSON then tried to identify these individuals based upon descriptions. FERGUSON then named Michael VELASQUEZ (Hispanic male, DOB: 01/04/1979, FBI: 188851AB5, SID: IL36214780, CPD IR: 1132218). Describing him as "You're thinking of Mike—with the long hair in braids?" S/A Labno then explained to FERGUSON that along with selling and transporting contraband cigarettes to places like Chicago and New York, S/A Labno was involved with trafficking firearms to New York. S/A Labno advised that he wanted FERGUSON's permission and advice to seek out VELASQUEZ and others to obtain firearms to traffic. FERGUSON responded, "That was Jessie and them. I was trying to help them." S/A Labno asked FERGUSON, "Should I talk to them about it; you fuck with them, you know them." FERGUSON then became visibly nervous and told S/A Labno, "Yeah, but I don't fuck with them on that level. You know if you're a gang banger I don't want no part of it." S/A Labno asked if it was too much "heat," and FERGUSON replied, "I don't like to fuck around with it too much at all—that's trouble." S/A Labno replied, "Yeah, but those are the guys who do fuck around with that stuff. I'm not cutting your throat by talking to them about it?" FERGUSON responded, "No, not at all. What you do with them is your business. I don't need to know nobody's business." FERGUSON then advised, "Jessie's supposed to be getting out in a couple of weeks."

12. As S/A Labno moved to leave, the two men briefly discussed the house in Indiana. S/A Labno asked if he could get the address of the residence which FERGUSON was selling in Indiana. FERGUSON agreed and advised, "If you like it I'll go fifty for you." At approximately 1259 hours, S/A Labno thanked FERGUSON and then left the area in his undercover vehicle.

13. This is only a summary of this undercover contact, and reference should be made to the electronic surveillance evidence inventoried as evidence pursuant to this undercover contact for more information.

REPORTS_001-000972