UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No 18 CR 734 |
| vs. | ) | Hon. Matthew F. Kennelly |
| | ) | |
| | ) | |
| TERRY FERGUSON | ) | |

**AFFIDAVIT OF BEAU B. BRINDLEY**

I, Beau B. Brindley, hereby swear and affirm that the following facts are true and accurate the best of my recollection.

1. On or about March 7 and March 8, 2021, the undersigned engaged in discussion with his client Terry Ferguson regarding a proposed plea agreement from the government and whether or not Mr. Ferguson would ultimately agree to its terms and enter a guilty plea in case 18 CR 734.

2. From the very beginning, these conversations were beset by Mr. Ferguson's fears about the ATF agents in this case and whether or not they would not continue to "go after [him] and try to "fuck him over" for the conduct that was investigated by the ATF in case 18 CR 734. Mr. Ferguson was insistent that they would never stop, that the agents would keep going after him unless there was something to stop them. He continually recounted the events of his case—how agents kept pushing him to provide cocaine when he wanted to make purchases for cash, how they illegally searched his home, how they reacted when they found out about his video security system, how Agent Labno had been criticized for possible perjury in another case involving an ATF whistleblower, and how they kept driving by his home after the Court announced its criticism of their behavior.

1

Mr. Ferguson's concerns about the ATF agents and what he believed to be a vendetta against him were almost manic. He was shouting. He was frenetic in his descriptions of what they had done to him and what they would do to him unless "some Court puts a stop to it."

3. Mr. Ferguson plainly said that, if he did not get protection against the ATF agents coming after him for the things they investigated in this case after he pled guilty, then he would never enter a guilty plea in this case. He said that he wanted to keep fighting the case all the way through trial unless he could be sure that they would not keep trying to "fuck him over for what happened in this case." Specifically, Mr. Ferguson told the undersigned something very close to the following: "Unless the law stops them from doing it, they will never stop coming after me for what happened in this case. So, I need to know. Will this plea put an end to these ATF agents coming after me for what happened during this investigation? Because, if it does not stop them, then they will keep coming for me. You don't believe me. But I am telling you."

4. As the undersigned listened to Mr. Ferguson's concerns, he was of the belief that, upon the entry of a plea resolving a federal case, it is absurd to think that federal agents would keep pursuing someone on their own through some other sovereign. That never happens. It is not a concern. Yet, to Mr. Ferguson, it was the primary concern. Mr. Ferguson specifically asked the undersigned to show him where in the agreement it prevents them (the ATF) from "coming after me for what happened in this case."

5. From the undersigned's perspective, this plea had taken a huge amount of work. Extensive memoranda had been sent repeatedly to the government in pursuit of a possible plea. A meeting was conducted with the supervisors at the US. Attorney's

Office in an effort to get a plea that would allow for a probationary sentence, no mandatory minimums, and the return of certain property to Mr. Ferguson. After a huge amount of work—more than he had ever put into any other plea that he can recall—the undersigned got the government to agree to these terms.

6. Yet, during the discussion with Mr. Ferguson, none of these terms were satisfactory. He harped on only one subject. His comments were along the lines of: "The ATF agents are corrupt and they will keep coming after me unless we have something to stop them." He was clearly afraid of the agents. He was absolutely terrified that they would pursue him even if the federal case was resolved by a guilty plea. He reminded the undersigned that the undersigned said this is a winnable case at trial. He reminded him that he said that an acquittal was the best way to put an end to this once and for all. The undersigned could not dispute having told him those things. He said these things because they were true. This is a very winnable entrapment case. He told Mr. Ferguson that it was a better entrapment case than *U.S v. Deleon*, 05 CR 249, in which the undersigned was able to obtain an acquittal on all drug charges regardless of far worse facts. Yet, the undersigned had worked long and hard on this plea to try to spare Mr. Ferguson and his family the stress and risk of trial. Regardless of this being a very compelling entrapment case, nothing is certain. The undersigned worked very hard, and spent a great deal of time, working on the plea and cannot deny that, at this point, he wanted Mr. Ferguson to sign it.

7. The trial date was set for April 12, 2021. The undersigned's extensive work on the plea agreement had taken away from the time he would have needed to be preparing for trial. Other trials and issues had also left him with extremely limited time

in which to get the prepared to try this case as would be needed for an entrapment defense.  In the back of his mind, he was worried about being inadequately prepared to try the case and he believed that, in reality, Mr. Ferguson's fears were ill founded.  No federal agent would do what he was suggesting.  No agent would go out on their own to pursue charges for conduct that was a part of a federal investigation resolved by a written guilty plea between the parties.  This was the mindset the undersigned has as he was confronted Mr. Ferguson's concerns. There was no doubt in the undersigned's mind.  Mr. Ferguson would not plead guilty unless the plea agreement guaranteed that the ATF agents that worked on this investigation could not continue to pursue criminal charges against him based on the investigation, undercover operation, and conduct that took place as part of this federal investigation undertaken for the U.S. Attorney Office for the Northern District of Illinois.  He made that absolutely clear. He asked the undersigned to show him where in the agreement did it stop them from doing that.

8. In response, the undersigned, who believed this was a concern that would never come to fruition, looked through the agreement and identified the paragraph indicating that the agreement was binding on the US Attorney's Office for the Northern District of Illinois.  He pointed that out to Mr. Ferguson.  He told him this language binds that US Attorney's Office and everyone who worked for them on this case.  It limits them to pursue only the charged agreed to here—the two counts to which you plead guilty.  He told him that the ATF agents worked on behalf of the US Attorney's Office and were also bound by the agreement.  He told him that, outside of the two charges to which a guilty plea was entered, these agents could not pursue criminal charges for anything else that happened in this case.  The plea agreement provides that protection.

9. Mr. Ferguson specifically asked him if the ATF agents could try to go to some state court to use what they got from the federal investigation to try to get him other charges and more prison time. The undersigned again pointed to the word "bound." He told him that this means they cannot do that. He told them something very close to: "They are bound to penalize you only for the charges to which you plead guilty; they cannot go after you for any other part of this federal investigation—that means the US Attorney's Office and the ATF agents who work for them cannot pursue criminal charges against you for any other part of the federal investigation in this case—not in federal court or anywhere else. These agents are bound not to do that. If you sign this plea, they are prohibited from doing that by law." As the undersigned read those words in the plea agreement, he believed that the entry of the federal plea did indeed stop any future pursuit by the federal agents on the case that would use the products of the federal investigation. He read that language to say what he wanted it to rather than what it specifically said. Looking back, he should have demanded more explicit language. He should have taken other steps to be sure. But he did not. After all the work that was done, he needed to get the plea signed or rejected. He did not take the further steps he should have.

10. After having that language reviewed with him repeatedly, Mr. Ferguson said that he trusted the undersigned's knowledge of the law. He said something close to: "If this plea agreement stops these ATF bastards from going after me for what happened in this case," then I will sign it. It was the undersigned's apparently inaccurate explanation of the language of the plea agreement and its terms that led directly to Mr. Ferguson agreeing to, and ultimately signing, the plea agreement.

11. On the day of the guilty plea, prior to the plea's entry, Mr. Ferguson again

asked the undersigned if he was sure that the guilty plea prevented the ATF from going after him for what happened in this case in some other court. Again, the undersigned pointed him to the same language and told him that the plea would not allow them to do that. It was based on that understanding of the plea agreement's terms and language that Mr. Ferguson entered his guilty plea. There is no way to deny that he entered the guilty plea in this case and signed the plea agreement specifically because of the undersigned's inaccurate explanation of the plea agreement's terms. The undersigned wishes it was not so. But there is no way to deny it.

12. In terms of the timing of Mr. Ferguson bringing this issue to the Court's attention, that timing had nothing to do with Mr. Ferguson. When he first became aware that Mr. Ferguson was actually being charged in Will County, the undersigned was engaged in another trial. Mr. Ferguson continually insisted it was the ATF that was doing this and that the undersigned told him that could not happen. When the undersigned finally got to reviewing the discovery in the Will County case, he discovered that Mr. Ferguson was right. Shortly after that, he identified the issue in Mr. Ferguson's sentencing memorandum. Further conversations with Mr. Ferguson made it clear that, as much as the undersigned might not like it, this motion has to be brought as Mr. Ferguson did not correctly understand the terms of his plea agreement at the time he entered his guilty plea. That was entirely the fault of the undersigned.

Signed and Affirmed,

By: S/ Beau B Brindley

Attorney for Defendant

LAW OFFICES OF BEAU B. BRINDLEY
53 West Jackson Boulevard
Suite 1410
Chicago, Illinois 60604
(312) 765-8878