UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| UNITED STATES OF AMERICA | ) | |
| --- | --- | --- |
| | ) | No 18 CR 734 |
| vs. | ) | Hon. Matthew F. Kennelly |
| | ) | |
| | ) | |
| TERRY FERGUSON | ) | |

**MOTION TO COMPEL**

COMES NOW the Defendant, Terry Ferguson, by and through his attorney, Beau B. Brindley, and moves this Honorable Court to enter an order preventing Special Agent Christopher Labno from making contact with any of the sentencing witnesses Mr. Ferguson has identified and compelling the government to indicate whether Labno's involvement in contacts with defense witnesses was authorized by the US Attorney's Office. In support, he states as follows:

**I.  FACTUAL BACKGROUND**

On October 30, 2018, federal agents approached the home of Mr. Ferguson to execute a search warrant. Facts regarding that search have been detailed in Mr. Ferguson's motion to suppress evidence and in his motion to dismiss based on prosecutorial vindictiveness. All of the factual information from those filings is hereby incorporated.

As the Court is aware, Mr. Ferguson was initially approached by Agent Chris Labno, who was acting in an undercover capacity. Labno offered Mr. Ferguson North Face jackets and cigarettes for an extremely low price. Mr. Ferguson agreed to purchase those items so that he could resell them in the future. He paid for them in cash. He did not offer to provide Labno with drugs. He did not offer to provide Labno with guns. All he stated was that he was interested in

1

buying North Face jackets and cigarettes for an incredibly low price. That is all Mr. Ferguson suggested he would do.

The idea of Mr. Ferguson having anything to do with cocaine did not originate with him. After successful sales of North Face jackets and cigarettes to Mr. Ferguson for cash, it was Agent Labno who first raised the prospect of exchanging cocaine for the jackets and cigarettes he was seeking to sell. When Labno asked Mr. Ferguson if he could provide guns or drugs as payment for the items they sought to sell, Mr. Ferguson was captured on tape saying, "I don't do that." Labno offered Mr. Ferguson, a known seller of various goods, an extraordinary opportunity to obtain valuable jackets and cigarettes for an unbelievably low price, and tried to get him to pay for them with cocaine. When faced with that opportunity, Mr. Ferguson said he was not involved with cocaine. But Labno did not leave him alone. He did not accept that answer. Instead, he kept pursuing Mr. Ferguson with better and better deals for goods he knew Ferguson wanted. Agent Labno was undercover when he dealt with Mr. Ferguson. Mr. Ferguson was dealing with him for the purchase of goods. He had an ongoing relationship with him. And, even then, Mr. Ferguson's answer on guns and drugs was "I don't do that." From that moment on, the pursuit of Terry Fegruson was not a standard or proper investigation. It continued, not because of a good faith pursuit of a drug dealer, but because of a personal animus toward Mr. Fegruson.

Ultimately, Labno targeted Mr. Ferguson and pursued him relentlessly even after being told that Mr. Ferguson was not involved in the distribution of cocaine. In simple terms, Labno did his best to manufacture a drug crime where was one was not previously existent. Eventually, Agent Labno persuaded Jesus Dominguez, who introduced him to Ferguson, to provide Labno with cocaine in exchange for the items Labno knew Mr. Ferguson wanted to obtain. Mr. Ferguson, in turn, purchased these items from Dominguez. Without Agent Labno, Terry

Ferguson would have never been in a position where anyone was trying to involve him with cocaine. But, Agent Labno created that situation.

To pursue Mr. Ferguson, Labno smoked crack repeatedly with Jesus Dominguez. He utilized a second informant who was actually engaged in illegal counterfeiting at the time he was working as for Labno. He directed this informant to play upon Mr. Ferguson's sympathies that were extreme and wholly unnecessary if the goal was to see what Mr. Ferguson would be willing to do if left to his own devices. During his undercover meetings with Mr. Ferguson, Agent Labno's recording devices were strangely not turned on at critical times. He replaced what should have been recordings with his own renditions of events. He contacted law enforcement officers in Wisconsin in an attempt to connect Mr. Ferguson with a lawnmower theft with his only evidence being that Mr. Ferguson had a lawnmower delivered to his home in Illinois while under surveillance. No surveillance officer observed any serial number. No surveillance officer overheard any conversation regarding Mr. Ferguson knowing that a lawnmower he purchased was stolen. Yet, Labno nonetheless contacted Wisconsin authorities and accused Mr. Ferguson of possession of stolen goods. All of this was done prior to the search of Mr. Ferguson's residence.

On October 30, 2018, agents began banging on the door to Mr. Ferguson's home at 5:59 am. Mr. Ferguson was in handcuffs and in the custody of officers at 6:00:33 based on the surveillance footage that was provided to the Court as an exhibit Mr. Ferguson's reply to his motion to suppress.[1] Mr. Ferguson was in custody within 13 seconds of the agents knocking on the door. The government, at one point, suggested that Mr. Ferguson's daughter let them into the

---

[1] The times on this video are one hour behind the actual time. Thus, the times adjusted by one hour in the this motion.

house. They got that information from the agents. That claim was false. The door was opened and Mr. Ferguson's teenage daughter was violently pulled out of the home by officers at 5:59:43. How did the information provided to the government end up being inaccurate? Because Labno chose to tell government counsel a false version of events.

The officers immediately entered the residence after the daughter was pulled out of the house. Mr. Ferguson was taken out of the house at 6:06:54. This means he was in custody AND removed from the residence within 7 minutes of the officers' arrival at the residence. The surveillance footage showed agents enter Mr. Ferguson's bedroom for a purported protective sweep at 6:01:25. Agents then left that bedroom and kicked in the bedroom door of Mr. Ferguson's fourteen-year-old son and his eleven-year-old grandson. Those individuals were escorted downstairs at 6:01:48.

Once a protective sweep had been conducted, there was no legitimate basis for reentry into the suspect's bedroom. Yet, for some reason, Agent Labno chose to enter and leave that room multiple times. they do not get involved with drugs and guns. But Agent Labno did so in this case.

At 6:03:16, Mr. Ferguson's son, Trace Ferguson, was escorted upstairs from his bedroom in the basement. At that point, the residence was fully swept. All occupants were upstairs. There was no sense in which any further return to bedrooms could constitute a protective sweep. Nonetheless, at 6:05:13, agents returned to the basement and remain there for approximately three minutes. Again, the normal protocols of protective sweep, which should be followed in every case, were not followed in the investigation of Mr. Ferguson.

At 6:08:26, after returning from the basement, and after Mr. Ferguson was removed from the house in custody, agents entered the garage. They entered the garage without a warrant. A

protective sweep would not permit the access and writing down of lawnmower serial numbers. But Agent Labno did that too.

Without ever being given permission to enter the residence or remain in the residence, the agents allowed these Wisconsin officers to enter the house. Every agent knows you cannot bring officers uninvolved in any kind of protective sweep or securing of a premises to come inside a house without a warrant. Here, they did it anyway. Totally uninvolved officers were allowed to traipse through Mr. Ferguson's residence after he was in custody and gone. And, without her permission to let them in in the first place, these officers were allowed to approach Mrs. Ferguson and speak to them while inside a premises in which they had no lawful authority to be present. That was totally improper. Labno knew it. And he let it happen.

Despite the agent's claims that no search continued after the protective sweep, at 6:14:06, after Mr. Ferguson was out of the house, and after the bedroom has already been swept and reentered, agents reentered Mr. Ferguson's bedroom again. There was no plausible claim that they were doing any protective sweep. They remained in that room searching for two minutes.

After this additional search of the other upstairs bedrooms, agents reentered Mr. Ferguson's bedroom again. They did not leave that bedroom until 6:20:20. To make matters worse, the agents not only reentered the bedroom themselves after it was already swept and Mr. Ferguson was already out of the house, but they permitted other officers to enter the bedroom as well. State police officers entered Mr. Ferguson's bedroom at 6:14:20 and remained there looking around and searching for two minutes. None of this is appropriate agent behavior. An experienced agent like Labno knew it. And he let it happen.

At 7:43:59, Labno entered Mr. Ferguson's bedroom alone and remained there for approximately one minute. At 9:12:01, Agent Labno entered Mr. Ferguson's bedroom alone

5

again. He remained in the room walking around and searching until 9:15:38. He knew it was wrong and he did it anyway.

At 8:53:05, Agent Labno is seen on video searching Mr. Ferguson's truck. It is not until 8:56:30 when Mrs. Ferguson is seen on video signing the consent to search. This Court has already noted that the agent report regarding this consent to search the truck contains false statements. Labno knew he was not allowed to do that and he did it anyway.

The agents claimed that Mrs. Ferguson took the agents to the bedroom where she pointed out the phone, which agents seized. This was also false. The video plainly shows agents take Mrs. Ferguson up to the bedroom at 8:43:24 and direct her inside the room, where she picks up phone and gives it to them. She followed their directions. She did not obtain this phone of her own free will. They did not recover the phone from the room as they claimed. The report is again plainly false. That is inconsistent with what agents are supposed to do. Labno knew it. He let it happen anyway.

Eventually, agents went to the home of Mr. Ferguson's son, Tim Ferguson. Instead of objectively handling the situation and asking for consent to search, agents threatened Mr. Ferguson. They suggested that he would lose his kids if he did not give them consent to enter his garage and cooperate with them. Tim was told that he needed to say whatever was in that garage belonged to his dad if he wanted to keep his kids. This was obviously a lie. A person's children do not get taken away simply because he chooses not to let law enforcement do a warrantless search. These kinds of coercive threats are not standard practice. But they were made at Agent Labno's direction.

After his arrest, Mr. Ferguson immediately told the agents he was "lawyered up" and wanted to speak to his counsel. Labno told him he was aware of that. He also admitted that he

specifically knew Mr. Ferguson was represented by the undersigned. That means Labno knew, from the moment of arrest, that he was speaking to a represented person. He also knew that this was not permitted. But he proceeded to interrogate Mr. Ferguson about his attorney. Every agent knows you do not speak to a represented person without contacting counsel. But he ignored that constitutional requirement.

The interrogation about the undersigned happened immediately after Mr. Ferguson's removal from the residence. This discussion did not occur because Mr. Ferguson made any unsolicited comment about his attorney. All he said was he had counsel and wanted his lawyer. Mr. Ferguson was asked if he had his attorney (the undersigned) dead to rights. This was without Mr. Ferguson ever suggesting his attorney had done anything wrong. That is an appalling thing for an agent to suggest on his own with no statement from the arrestee.

When Mr. Ferguson ultimately admitted that he does not know of his attorney doing anything illegal (as reflected in the agent report), Labno told him, "Ok, then the guns are going on you." Mr. Ferguson requested video from the interrogation room because of a visible camera. No video of this discussion was ever provided. Mr. Ferguson was later charged for a firearms offense.

Terry Ferguson had every right not to speak to agents at all. When he said he was "lawyered up" and wanted his attorney, Labno knew he should not speak another word to him. But he did so anyway. Mr. Ferguson's inability to provide information that Agent Labno hoped to obtain, but did not exist, is certainly not grounds for retribution from law enforcement. But, Labno made it plain. Incriminate your lawyer or pay the price. When Mr. Ferguson told the only truth he could—that he knew of nothing improper about his lawyer—Labno saw to it that a price would be paid. All of this is antithetical to anything remotely resembling proper procedure.

Yet, it happened because of the specific attitude that Labno took with respect to Mr. Ferguson and apparently with respect to his lawyer too.

Shortly after his arrest, Mr. Fergusons niece, Debbie Millwood, was summoned by child services. She was led to believe that there was a problem with her children. She has had issues with child services in the past and became extremely concerned that she could lose her kids. As a factual background, Ms. Millwood is the victim of repeated molestation and rape by a Thai Buddhist monk. Ms. Millwood's daughter is a product of this molestation. She suffered years of intense psychological trauma involving anxiety and depression as a result of these experiences. Mr. Ferguson assisted her in filing a lawsuit against the temple where the offending monk was permitted to serve. Ms. Millwood received an undisclosed, substantial settlement as a result of this litigation. Agent Labno was well aware of these facts. It was, indeed, because of these facts that Agent Labno approached child services and attempted to manipulate Ms. Millwood. Child services officers misled Ms. Millwood regarding the reason she was called. They lied to her at the direction of an ATF agent—Chris Labno. Ms. Millwood arrived, stricken with concern regarding whether she might lose her children. Upon arrival, the child services officers led Ms. Millwood into a room where Agent Labno and another agent were present. She was not told she was free to leave. The door was closed and she was confronted by these two agents. They knew she was the victim of molestation and extremely traumatized.

Agent Labno then implored Ms. Millwood to provide him with incriminating information about Mr. Ferguson, his assistance with her lawsuit, and his power of attorney. When she had no incriminating statement to make, Labno promised Ms. Millwood more money and a better house for her kids if she would say that Mr. Ferguson forced her to sign the power of attorney used to

get her lawsuit litigated or perpetrated some other kind of fraud in obtaining that power of attorney or managing her settlement funds.

  When Ms. Millwood again said that her uncle did no such thing, Labno emphasized the resources Ms. Millwood would get if she would simply incriminate Mr. Ferguson. He made disparaging remarks about Mr. Ferguson and that he wanted to see him in prison. Agent Labno pressured her further, repeatedly telling her about all of the money he could get for her if she would incriminate Mr. Ferguson. Confronted with this questioning, Ms. Millwood told Labno he should talk to her lawyer. Labno then stated, "tell me your lawyer is not that piece of shit, Beau Brindley." Ms. Millwood explicitly told him the undersigned was her lawyer and had been for many years. Hearing about an existing attorney/client relationship, Labno did not accept it. He told Ms. Millwood that the undersigned was her uncle's lawyer, not hers. This was not true at all. These two representations were not mutually exclusive and Labno knew it. Nonetheless, he attempted to make Ms. Millwood believe otherwise. The undersigned represented Ms. Millwood for years and assisted her with her lawsuit as well as with some issues regarding child services. She was quite right to tell Labno that the undersigned was her lawyer. On the other hand, what Labno did was quite wrong. And he knew it.

  In his conversation with Ms. Millwood, Labno explicitly endeavored to interfere with an attorney/client relationship that predated his investigation of Terry Ferguson, spoke to a represented person without contacting her lawyer, traumatized a psychologically damaged woman, and expressed a personal dislike for the target of his investigation and his lawyer. Ms. Millwood then contacted the undersigned and requested that Labno not contact her again.

  After being released on bond, Mr. Ferguson was stopped in his vehicle by CPD officers. The purpose of the stop was to make an arrest based on a warrant for arrest out of Wisconsin,

where Mr. Ferguson was charged with possession of a stolen lawnmower. When Mr. Ferguson was removed the car, Agent Labno was present. Why Agent Labno was present for a CPD arrest based on a Wisconsin warrant for possession of stolen property remains a mystery. However, Labno's conduct during this traffic makes his intent apparent. First, Agent Labno searched Mr. Ferguson's vehicle without a warrant after he was already removed from the vehicle. The Chicago police officers on scene questioned why Labno was getting into Mr. Ferguson's vehicle. With no authority whatsoever, Agent Labno reviewed the contents notebook in which Ms. Millwood had written down notes on what Labno and the other agent did during their interrogation. Labno then became angry and seized that notebook, along with Mr. Ferguson's phone. Once again, Labno had no warrant. Once again, Labno had no authority to take this property. But he did. Agent Labno told Mr. Ferguson that he would not be getting out of jail this time. When Mr. Ferguson went to Court in Kenosha, Wisconsin for a possession of stolen property charge, Agent Labno was there.

On the record, the prosecutor indicated that Agent Labno provided information that formed the basis of a motion to increase Mr. Ferguson's bond to $1,000,000 ($100,000 deposit necessary for release). Labno told Wisconsin prosecutors that Mr. Ferguson was essentially a crime lord and significant drug trafficker in Chicago. None of this was true. The resultant reality is that Agent Labno made false statements to Wisconsin prosecutors for the purpose of unjustifiably increasing Mr. Ferguson's bond and thwarting the release ordered by Judge Cole. That bond was eventually lowered when another judge in Wisconsin could not find any basis to justify its severity.

Agent Labno was also the investigating agent who interrogated the person identified as Victim A in Mr. Ferguson's obstruction of justice case before Judge Norgle. As a result of

Labno's interrogation, which was not recorded, Victim A made statements indicating that Mr. Ferguson had purportedly made various comments deemed to be aimed at preventing him from testifying before the grand jury. Labno was present for Mr. Ferguson's arrest on this case as well. Labno again told Mr. Ferguson that, "this time, you are not getting out." The problem with Labno's interview of Victim A was that the report setting forth Victim A's comments was repeatedly and significantly contradicted by the testimony Victim A gave at the grand jury. In the face of all of these contradictions and an impending trial date, the government dismissed the felony charges against Mr. Ferguson, allowed him to plead to a misdemeanor, and agreed to his release on bond. The reason this happened is because the statement that resulted from Labno's interview of a scared guy living in a storage unit was so riddled with falsehoods that it could not be relied on.

On March 12, 2020, this Court held a status hearing. During this hearing, the Court expressed concern about false statements that were written in the report prepared regarding agents' search of Mr. Ferguson's residence. The Court stated its view that the report was not accurate and that the agents appeared to be conducting a search at a time they tried to claim a protective sweep as claimed in Mr. Ferguson's motion. The Court was critical of the agent behavior and contemplating an evidentiary hearing to make a record of what happened. The very next day, John Deir, one of the codefendants in Mr. Ferguson's obstruction of justice case, was unexpectedly arrested. He was pulled over by ATF agents. Ten minute later, Labno arrived on the scene and transported Deir to the Burbank Police Station. The arrest was perpetrated without an arrest warrant. After his arrest, Mr. Deir was placed in a room with Agent Labno. Deir immediately asked for a lawyer. Labno continued the interrogation nonetheless. He told him explicitly that he was not there because of his actions. He told Mr. Dier, "You are here because

of Terry Ferguson." It is worthwhile to note that the firearms purportedly possessed by Mr. Deir, which gave rise to the arrest, had no connection whatsoever to Mr. Ferguson. Labno proceeded to tell Mr. Deir that "All of this can go away if you just give me something on Ferguson." He told Mr. Dier to "Give me anything on Ferguson. I do not care what. Just give it to me and you walk out." That was followed by pejorative and inflammatory remarks about Mr. Ferguson and the undersigned. Mr. Dier had no information to provide. He was then charged with a firearms crime by the attorney general's office rather than Cook County. Labno's willingness to manipulate a criminal prosecution of Mr. Deir for the sheer purpose of getting information about Mr. Ferguson is, once again, completely wrong. But Labno did it anyway. This is after a November 30 incident in which Mr. Deir was interrogated by Labno in front of Mr. Ferguson's house and told that, if he did not provide incriminating information on Mr. Ferguson, he would have big problems.

Finally, following Mr. Ferguson's first plea in this case, Labno went to the Attorney General in an effort to get Mr. Ferguson charged for events that occurred as part of the federal investigation, which were not charged by the federal government. These actions were taken without the knowledge or sanction of the US Attorney's Office. The same assistant AG who handled the Deir case also handled the Ferguson prosecution in Will County, which led to the withdrawal of Ferguson's plea in this case.

In the pursuit of Mr. Ferguson, Agent Labno has conducted illegal searches, engaged in acts of coercive threat and intimidation, interfered with attorney/client relationships, violated constitutional rights, provided false information to prosecutors, provided false information in agent reports, victimized a psychologically damaged young woman, and plainly stated his personal vendetta against Terry Ferguson.

12

## II. Contact With Witnesses

Pursuant to this Court's order, Mr. Ferguson filed his witness list in this case. On August 17, 2023, Agent Labno appeared at the home of John Deir, telling his wife that he was sent by the US attorney to ask him about being a witness in a case. Similar contacts were attempted with Timothy Ferguson, Debbie Millwood, and others. Ms. Millwood was actually pulled over by federal agents. When she said she had a lawyer and did not want to talk to them, they continued to try to speak with her. Ms. Millwood believes Agent Labno was present.

Immediately following these contacts, witnesses began contacting the undersigned and indicating intense fear. They began to say that their previous agreements to testify voluntarily were withdrawn out of fear of Agent Labno. Agent Labno is the subject of public allegations regarding misconduct in this case. Since the witnesses who provided the information regarding this misconduct, which was included in the public filings, are now seeing the agent they accused show up on their property and contact them by phone, it is obvious why they are afraid. It is unknown whether Agent Labno was personally authorized by the government to participate in these witness contacts. However, his presence is intimidating defense witnesses and making them afraid to testify.

Witness intimidation of any kind cannot be condoned. All parties know that Agent Labno will be called by the defense at sentencing. They know he will be accused of engaging in misconduct and endeavoring to entrap Mr. Ferguson. Agent Labno knows that. He has surely seen the filings. Hence, allowing him to be the agent who approaches the witnesses referenced in the filings is troubling to say the least. Under the circumstances, his presence is obviously going to intimidate. It is obviously going to create fear of retribution for testifying. Debbie Millwood and John Deir both suffer extreme anxiety over what they say was Agent Labno

soliciting false information about Mr. Ferguson and threatening bad consequences when they could not provide it. John Deir believes he has already been criminally prosecuted as a result of this retribution.

These are important witnesses for the defense at sentencing. They have been disclosed in the interests of fairness and pursuant to the Court's order. Yet, they are now being intimidated by direct contact from an agent whose misconduct is at the heart of the evidence that will be presented at sentencing. There is no good faith reason for Labno to be the one approaching these witnesses. Any other agent could be used without causing this fear, anxiety, and feeling of intimidation. His involvement in these witness interviews is interfering with the defendant's ability to present his defense.

For this reason, Mr. Ferguson has two immediate requests. First, he requests that the government disclose to the Court whether Agent Labno was actually directed to participate in these witness contacts personally. Second, he requests an order preventing him from making further contact with defense witnesses. Mr. Ferguson will consult further with counsel regarding any other motions that may stem from these incidents. However, in the immediate moment, Agent Labno's conduct is creating a chilling effect on defense witness testimony. This is an unusual case. Significant misconduct by this agent has been alleged by multiple witnesses. Those witnesses are set to testify at this sentencing hearing. Under those circumstances, allowing the agent they have accused to be the one approaching them is obviously problematic. It is obviously likely to intimidate witnesses. And it is obvious that his involvement may interfere with Mr. Ferguson's ability to present the sentencing witnesses who have already agreed to participate. That kind of interference with the defense case must be stopped. Mr. Ferguson implores this Court to do just that.

WHEREFORE, the Defendant, Terry Ferguson, moves this Honorable Court to enter an order (1) preventing Agent Labno from participating in contacts or interviews with Mr. Ferguson's sentencing witnesses; and (2) compelling the government to indicate whether Agent Labno's personal involvement in these witness contacts was specifically requested or sanctioned by the US Attorney's Office.

Respectfully submitted,

S/ Beau B Brindley

LAW OFFICES OF BEAU B. BRINDLEY
53 West Jackson Boulevard
Suite 1410
Chicago, Illinois  60604
(312) 765-8878