UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA

v.

TERRY FERGUSON

No. 18 CR 734

Judge Matthew F. Kennelly

## GOVERNMENT'S MOTION *IN LIMINE* TO EXCLUDE TESTIMONY AND ARGUMENT AT SENTENCING

Defendant plans to call the majority of the witnesses on his witness list not to testify about anything relevant to the 18 U.S.C. § 3553(a) sentencing factors but rather to make irrelevant and false allegations of outrageous government conduct, primarily directed against ATF Supervisory Special Agent Christopher Labno. Defendant's allegations are neither supported by the evidence in the case nor witness affidavits. His allegations are neither relevant to the 3553(a) factors nor to the imperfect entrapment argument that defendant seeks to present to the Court. Indeed, many of defendant's claims involve events that purportedly happened after the defendant was charged and do not involve the defendant.

For the reasons outlined below, the government moves *in limine* to exclude testimony and argument: (1) that agents intimidated defendant's family and friends after charges were brought in this case; (2) that defendant was wrongfully prosecuted for obstructing a court order after he was charged in this case; (3) that an agent engaged in misconduct in an unrelated case; (4) that agents violated defendant's Fifth and Sixth Amendment rights during a search of his house that occurred after he was charged in this case; (5) that agents acted improperly in prosecutions against

1

defendant in Kenosha, Wisconsin and Will County, Illinois after defendant was charged in this case; and (6) that agents, particularly Agent Labno, engaged in various other kinds of misconduct. The government also moves to exclude: (7) the testimony of AUSA Paul Mower in its entirety; and (8) any argument in mitigation based on defendant's purported medical conditions.[1]

## I. BACKGROUND

### A. Procedural Posture

On November 9, 2015, defendant and Jesus Dominguez sold firearms and assorted ammunition to undercover agents (the UCs). Between April 2016 and October 2018, defendant, either alone or with one of his two co-conspirators, Dominguez and William Walsh, sold narcotics to the UCs and a confidential source. On October 29, 2018, defendant was charged by complaint with narcotics trafficking offenses. Dkt. No. 1. Defendant was later indicted on narcotics trafficking and unlawful possession of a firearm by a felon offenses. Dkt. No. 58, 410.

On January 3, 2023, defendant pled guilty to Counts One and Thirteen of the second superseding indictment, which charged him with conspiracy to distribute 500 grams or more of cocaine, in violation of 21 U.S.C. § 846, and unlawful possession of a firearm by a felon, in violation of 18 U.S.C. § 922(g)(1), respectively. Dkt. No. 424. Defendant also stipulated to having conspired with others to sell stolen goods with a

---

[1] The government moves for leave to file its motion in excess of 15 pages given the number of allegations set forth in defendant's sentencing memoranda, Dkt. Nos. 325 and 431, and his motion to compel, Dkt. No. 445, to which the government must respond.

value over $5,000, in violation of 18 U.S.C. § 2315. *Id.* Sentencing is set for October 19 and 20, 2023. Dkt. No. 446.

Defendant filed a sentencing memorandum on November 11, 2021, Dkt. No. 325, and an updated sentencing memorandum, which incorporated the previously-filed argument, on April 28, 2023, Dkt. No. 431. Based on these filings, the government expects defendant to seek to argue, pursuant to section 3553(a), that agents entrapped him, Dkt. No. 325 at 3-14; that agents violated his Fifth and Sixth Amendment rights, *id.* at 14-15; that agents interfered with court proceedings in Kenosha, Wisconsin, *id.* at 16; that agents intimidated Debbie Millwood, Timothy Ferguson, and John Deir, *id.* at 16-17; that defendant was wrongfully prosecuted for obstructing a court order, *id.* at 17; that agents shared investigative materials with the Illinois Attorney General's Office, *id.* at 18-20; and that defendant has certain medical conditions, Dkt. No. 431. The government has endeavored to condense these arguments, as well as other related arguments made in filings throughout this case, into categories that form the basis of its motions *in limine*.

## B.    Chronology of the Facts

To put defendant's anticipated arguments in context, the government presents the following chronological recitation of the facts in this case. The majority of these facts are reported in Probation's PSR, Dkt. No. 292, and Updated PSR, Dkt. No. 323. Defendant has not objected to any of the facts in the PSR or Updated PSR in any of his filings.

3

### 1. Defendant sold cocaine to Jesus Dominguez from 2012-2015

Beginning in 2012 or 2013, Dominguez began purchasing cocaine from defendant. PSR ¶16. By 2014 or 2015, defendant was supplying Dominguez with one to two ounces of cocaine per week. *Id.* The cocaine cost $1,200 to $1,400 per ounce, and defendant fronted it to Dominguez. *Id.*

### 2. On November 9, 2015, defendant and Dominguez sold firearms and ammunition to the UCs

In October 2015, at defendant's direction, Dominguez and an individual he believed to be defendant's nephew stole a safe from defendant's neighbor's house in Willowbrook and took the safe to a house defendant owned in Nottingham Park. PSR ¶17. The safe contained firearms. *Id.* Defendant asked Dominguez to find a buyer for the firearms, suggesting a price of $20,000. *Id.*

Dominguez contacted a person who, unbeknownst to him, was a confidential source (CS-1), and CS-1 alerted law enforcement. PSR ¶18. CS-1 then connected an undercover agent (Special Agent Labno) with Dominguez as a potential buyer for the guns. *Id.* On November 9, 2015, Dominguez met Agent Labno and other UCs and sold the UCs 23 firearms and assorted ammunition in exchange for $10,000 and some purportedly stolen merchandise. *Id.* This was the first time that Agent Labno had ever met, or even communicated with, defendant. It was at this meeting that agents identified defendant, and they subsequently ran his information through law enforcement databases. Exh. A (database check report for defendant from 2014 to

2022).  This was also the first time that the UCs provided purportedly stolen merchandise to defendant or Dominguez.

Defendant arrived during the transaction and provided Dominguez with keys to defendant's food truck, where the guns and ammunition were stored. PSR ¶19. Dominguez gave defendant the $10,000 cash from the transaction. *Id.*  The merchandise that the UCs gave Dominguez and defendant was later sold for $3,000 or $4,000. *Id.*

### 3.    On January 13, 2016, defendant attempted to sell cocaine to a confidential source

On January 13, 2016, in the presence of law enforcement, a different confidential source (CS-2) had a series of recorded telephone calls and text messages with defendant in which defendant agreed to sell CS-2 two ounces of cocaine for $1,600. Exh. B (ROI 14).  Defendant called off the transaction shortly before it was set to occur, and he told CS-2 that police had been spotted near the location for the transaction. *Id.*

### 4.    From March 2016 to December 2016, defendant and Dominguez sold cocaine to the UCs

Attached as Exhibit C is a summary chart of the controlled purchases of cocaine from defendant and his associates.[2]

March 24, 2016 Cocaine Transaction:  On March 24, 2016, the UCs used cash to purchase 45.8 grams of cocaine from Dominguez, which defendant supplied. PSR ¶21.

April 14, 2016 Cocaine Transaction: On April 14, 2016, the UCs received 27.6 grams of cocaine from Dominguez. Shortly before the transaction, defendant and Dominguez were in close proximity, near Dominguez's house. PSR ¶22.

May 3, 2016 Cocaine Transaction: On May 3, 2016, defendant and Dominguez drove to defendant's mothers' house in Nottingham Park. PSR ¶23. Defendant gave 10 ounces of cocaine to Dominguez, who was to give it to the UCs in exchange for over 300 cartons of cigarettes. *Id.* The UCs and Dominguez met, and Agent Labno weighed the 10 packages of cocaine, noting that several were short of the expected weight. PSR ¶24. Dominguez then called defendant, who came over. *Id.* When defendant arrived, he admitted to packaging the 10 baggies of cocaine himself. *Id.* After discussing weights, defendant agreed to add an extra quarter ounce of cocaine to what was already supplied. *Id.* After further discussion, defendant agreed to provide the UCs an extra full ounce of cocaine (not a quarter ounce) in exchange for $300 and more cigars and cigarettes. *Id.* The cocaine in this transaction weighed 305.2 grams. PSR ¶25.

May 19, 2016 Cocaine Transaction: Prior to May 19, 2016, Agent Labno and Dominguez spoke about exchanging cocaine for cigarettes. PSR ¶26. On May 18, 2016, defendant supplied Dominguez with 11 ounces of cocaine for distribution. *Id.* The following day, the UCs, defendant, and Dominguez met and discussed the

---

[2] The chart also includes the November 2015 firearms transaction and the attempted January 2016 CS-2 cocaine transaction.

transaction, and defendant told the UCs that he was waiting for his cocaine supplier to bring an additional 9 ounces to make a 20-ounce transaction. PSR ¶27. Later, the UCs and Dominguez met, and Dominguez gave the UCs 11 ounces of cocaine. PSR ¶28. Defendant arrived and said his supplier was delayed in traffic with the final 9 ounces of cocaine. *Id.* After receiving a message from his supplier, defendant left to get the cocaine, and Dominguez met him at another location. *Id.* Later, Dominguez provided the additional 9 ounces of cocaine to the UCs. *Id.* In exchange for the cocaine, the UCs gave defendant and Dominguez 453 cartons of cigarettes and cigars. Exh. C. The cocaine in this transaction weighed 556.5 grams. Updated PSR ¶11. During this transaction, Agent Labno and defendant exchanged contact information. Exh. H (Cellebrite report of defendant's phone showing Agent Labno was added as a contact on May 19, 2016); Exh. I (toll records for defendant's phone number (ending in 4063) showing the first contact with Agent Labno's phone number (ending in 5570) was on May 19, 2016).

August 31, 2016 Cocaine Transaction: After the May 19, 2016 transaction, Dominguez was incarcerated on various charges, and Agent Labno began communicating directly with the defendant. PSR ¶30. On August 26, 2016, Agent Labno called the defendant, told him that he had North Face items, and asked about exchanging them for 9 ounces of cocaine. PSR ¶31. Four days later, Agent Labno told defendant on a call that he had a lot of merchandise and wanted to exchange it for 12 ounces of cocaine. PSR ¶32. Defendant and Agent Labno agreed to settle on a final

arrangement when they met in person. *Id.* On August 31, 2016, the UCs and defendant met. PSR ¶33. The UCs showed defendant boxes of merchandise. *Id.* Defendant offered to trade $4,000 worth of cocaine for it, and Agent Labno agreed. *Id.* Afterward, defendant and UCs met at another location, and defendant directed Agent Labno to a wheel well of a trailer, where Agent Labno recovered a bag containing four baggies of cocaine. PSR ¶34. The UCs gave defendant about 300 items of merchandise. Exh. C. The cocaine in this transaction weighed 111 grams. PSR ¶35.

December 7, 2016 Cocaine Transaction: On December 5, 2016, Agent Labno told the defendant on a call that he had merchandise to trade. PSR ¶36. Two days later, the UCs and defendant met and agreed to exchange the UCs' merchandise for 3.5 ounces of cocaine, and that the UCs would purchase an additional half ounce of cocaine. *Id.* The merchandise was loaded into a box truck, and defendant directed where in the truck to stack it. *Id.* Then codefendant William Walsh handed Agent Labno the cocaine in exchange for $500. *Id.* The cocaine in this transaction weighed 110 grams. PSR ¶37.

December 14, 2016 Cocaine Transaction: During communications on December 13 and 14, 2016, defendant agreed to exchange 14 ounces of cocaine with Agent Labno for about 500 cartons of cigarettes. PSR ¶38. On December 15, 2016, the UCs met Walsh at a house defendant had previously used to conduct narcotics transactions. *Id.* Inside the house, Walsh gave the UCs a sock containing bags of

cocaine. *Id.* In exchange, the UCs and Walsh unloaded boxes of cigarettes into the house. *Id.* The cocaine in this transaction weighed 391.6 grams. PSR ¶39.

In his plea agreement, the defendant agreed that he stored cocaine for the 2016 transactions in the detached garage at 7038 West 72nd Street in Chicago, Illinois, a property he controlled, but where he did not reside. Updated PSR ¶10. Defendant was also observed going to that garage to retrieve cocaine. *Id.* During a conversation with a UC, defendant said he put his brother at the 7038 address and had another person reside there to watch his brother. *Id.* He also stated he had his son (Timothy Ferguson) reside across the street to watch the defendant's brother. *Id.*

### 5. From January 26, 2018 to October 22, 2018, defendant sold cocaine to a confidential source

On multiple occasions in 2018, the defendant sold CS-2 narcotics. PSR ¶40; Exh. C. These transactions occurred from January 26, 2018 to October 22, 2018. Supp. Govt. Version. Each transaction occurred at or near the defendant's mother's house in Chicago. PSR ¶40. During each of these transactions, the defendant sold

one ounce (28 grams) of cocaine to CS-2. PSR ¶41. The total combined weight of these transactions was 333.4 grams of cocaine. PSR ¶42.

The total quantity of cocaine involved in the offense is at least 1.88 kilograms. Updated PSR ¶12.

### 6. On October 29, 2018, defendant was charged, and a warrant was issued for his arrest

On October 29, 2018, defendant was charged by complaint with narcotics trafficking, and a warrant was issued for his arrest. Dkt. Nos. 1, 4, 5.

### 7. On October 30, 2018, agents arrested and interviewed defendant and searched defendant's house

On October 30, 2018, agents arrested defendant and searched his house pursuant to a search warrant. Exh. D (ROI 172). Later that day, agents interviewed defendant. *Id.* The government does not intend to use evidence obtained during the execution of this search warrant or the interview of defendant at sentencing, nor is any such information referred to in the PSR or Updated PSR.

### 8. On October 30, 2018, agents conducted a consent search of the garage of the house where defendant's son Timothy Ferguson was staying

That same day, on October 30, 2018, agents executed a consent search of the detached garage of the house where defendant's son Timothy Ferguson was staying. Exh. E (ROI 166). During the search, guns and suspect cannabis were found. *Id.* These items are not material to defendant's case, nor is any information about these items referred to in the PSR or Updated PSR.

**9.    On November 15, 2018, Agents Interviewed Defendant's Niece Debbie Millwood**

Agents observed a large sum of cash, jewelry, and other valuable items during the search of defendant's residence. Exh. D (ROI 172).  Agents conducted a financial investigation into defendant.  Agents learned that defendant's niece Debbie Millwood (O'Brien) had received a settlement in excess of $1.2 million, which defendant controlled. Exh. F (ROI 174). Records indicated that defendant had spent over $600,000 of Millwood's settlement money. *Id.*  For example, defendant used nearly $400,000 from Millwood's settlement to purchase his house in Willowbrook and distributed money to his associates, such as John Deir. *Id.*  Agents learned that the Department of Child Services was intervening to determine the welfare of the children because they had missed many school days. *Id.*  Agents contacted DCS in an effort to learn Millwood's current address and learned that Millwood had told DCS investigators that she was poor and requested help with housing to take care of herself and her children. *Id.* DCS investigators told law enforcement that Millwood claimed that her uncle (defendant) and her father had stolen most of her settlement money. *Id.*

On November 15, 2018, DCS met with Millwood, and agents then conducted a victim interview of Millwood. *Id.*  At the time agents interviewed Millwood, records indicated that she had received about $10,000 of her $1.2 million settlement. *Id.* Millwood stated, in summary, that did not know how much settlement money

11

defendant had been receiving and spending and that she believed defendant had stolen her money. *Id.*

### 10. On December 13, 2018, defendant was charged in case 18 CR 858 with intimidating a witness on November 17, 2018

On November 1, 2018, agents served Individual A with a subpoena to testify in the grand jury pursuant to the continuing grand jury investigation that led to charges in the instant case. Case 18 CR 858, Dkt. No. 1. On November 7, 2018, defendant's son Timothy Ferguson and defendant's friend John Deir, along with a third person, obstructed a court order by threatening that Individual A should not comply with that subpoena. 18 CR 858, Dkt. Nos. 148, 162. Specifically, Timothy called Individual A and told him that defendant "was not happy." *Id.* Then the three of them went to Individual A in person and, among other things, threatened that Individual A would get in trouble if he responded to the subpoena, told Individual A not to go to court, and took photos of the subpoena. *Id.* Timothy also later told Individual A that his father, defendant, would be visiting Individual A and again said that defendant was "not happy." 18 CR 858, Dkt. No. 162.

Defendant was detained from October 30, 2018 to November 7, 2018. Dkt. Nos. 8, 27. On November 17, 2018, defendant obstructed a court order by threatening that Individual A should not comply with the grand jury subpoena. 18 CR 858, Dkt. No. 156.

On December 13, 2018, defendant was charged with intimidating a witness in case number 18 CR 858, and a warrant was issued for his arrest, as well as the arrest of codefendants Timothy Ferguson and John Deir. 18 CR 858 Dkt. Nos. 1, 4, 5, 6, 7. Defendant later pled guilty to obstructing a court order. 18 CR 858, Dkt. No. 156. In his plea agreement, defendant admitted to the following facts:

> [D]efendant acknowledges that in approximately November 2015, ... [a] Grand Jury sitting in Chicago ... commenced a grand jury investigation into defendant's alleged commission of federal firearms, narcotics, and theft offenses.
>
> ...
>
> Defendant further acknowledges that on or about October 29, 2018, he and others were charged by criminal complaint ... with conspiracy to knowingly and intentionally distribute controlled substances .... As of November 17, 2018, defendant had knowledge of the Grand Jury Investigation and his pending criminal case.
>
> Defendant further acknowledges that on or about November 1, 2018, federal agents served Individual A with a subpoena requiring his appearance before the Grand Jury on November 14, 2018, for testimony and records regarding his prior business dealings with defendant.
>
> On November 17, 2018, ... [d]efendant approached Individual A and, in summary, repeatedly threatened that Individual A would get in trouble if he responded to the subpoena. Defendant falsely told Individual A that he had seen two indictments for tax evasion against Individual A and that Individual A would go to jail if he went to court. Defendant told Individual A to stop speaking with law enforcement, and that he would only get into more trouble if he continued to cooperate.
>
> Defendant admits that he engaged in the above-described conduct in order to prevent Individual A's compliance with the subpoena, which he knew to be unlawful.

18 CR 858, Dkt. 156 at 3.

13

**11.     On December 17, 2018, agents arrested John Deir**

John Deir was charged with defendant with obstruction of a court order by threatening Individual A in case number 18 CR 858.  A warrant was issued for his arrest on December 13, 2018. 18 CR 858, Dkt. No. 6.

Agents arrested Deir on December 17, 2018. 18 CR 858, Dkt. No. 11.  That same day, agents executed a search warrant for Deir's house, where they found guns, ammunition, drug paraphernalia, and cash. Exh. G (ROI 185).  None of these items are material to defendant.  Subsequently, Deir was charged with gun-related crimes in Cook County Circuit Court (case numbers 20CR0377401 and 20CR0673801), and pled guilty to a gun offense in December 2021 (case 20CR0673801).  After he was arrested on those charges in March 2020, agents attempted to interview Deir, but he requested a lawyer before any questions were asked, and the interview was terminated.  None of the evidence seized from Deir's house is material to defendant's case, nor is anything about Deir mentioned in the PSR or Updated PSR.

**12.     On November 28, 2018 and in May 2021, defendant was charged with crimes relating to stolen goods in Kenosha, Wisconsin and Will County, Illinois, respectively**

On January 3, 2019, defendant was charged by information in the Circuit Court of Kenosha County, Wisconsin, case number 2018CF001271, with multiple felony counts of conspiracy to commit theft, conspiracy to take and drive a vehicle without consent, and receiving stolen property, specifically trailers containing

lawnmowers, that allegedly occurred between February 12, 2018 and May 1, 2018. Defendant was originally charged by complaint on November 28, 2018.

On October 8, 2021, defendant was charged by superseding indictment in Will County, Illinois case number 21 CF 718 with multiple felony counts of organizing a continuing financial crimes enterprise to steal and resell goods, specifically Snap-On tools, Natural Balance pet food, and Suncast products, conspiracy, theft, and money laundering, that allegedly occurred between September 23, 2017 and November 2, 2018. Defendant was originally charged by indictment in May 2021.

In defendant's plea agreement, defendant stipulated to committing the offenses he was charged with in Kenosha and Will County. Specifically, he admitted to conspiring with others to receive, possess, conceal, store, sell, and dispose of goods with a value of $5,000 or more that crossed a state boundary after being stolen, between September 2017 and October 2018. Dkt. No. 424. He made admissions that relate to the stolen lawnmowers, Snap On tools, Natural Balance pet food, and Suncast deck products. *Id.*

## II. ARGUMENT

Pursuant to 18 U.S.C. § 3553(a), to impose a sentence, a court must consider the nature and circumstances of the offense, which occurred between November 9, 2015 and October 22, 2018, Dkt. No. 454, the history and characteristics of the defendant, the seriousness of the offense, respect for the law, and just punishment, deterrence, and protecting the public, among other specific considerations. Instead

15

of presenting argument on these facts, defendant seeks to obfuscate his own wrongdoing by raising assorted unsubstantiated claims of outrageous government conduct. This alleged conduct of law enforcement officers is outside the scope of the 3553(a) factors, and testimony and argument regarding these allegations have no place at defendant's sentencing hearing.

Defendant also seeks to present information to the Court about "imperfect entrapment." Dkt. No. 325 at 3-14. Based on the Court's comments during the parties' status hearing on June 1, 2023, the government understands that the Court will furnish defendant a limited opportunity to present evidence and argument on this topic.

Other than defendant's allegations concerning imperfect entrapment, the topics that he seeks to present to the Court at sentencing deal with irrelevant allegations about government conduct that occurred after defendant's offense conduct and after the defendant was charged, some of which do not involve defendant.

Defendant has repeated these false and unfounded allegations against law enforcement throughout this case. *See, e.g.,* Dkt. No. 325, 391, 445. The government continues to deny each and every allegation. Even if any of defendant's allegations had merit, which they do not, defendant's sentencing hearing would not be the proper forum in which to raise and argue them.

At sentencing, the Court is tasked with imposing a sentence that is sufficient but not greater than necessary to comply with the sentencing factors set forth in 18

16

U.S.C. § 3553(a). Sentencing is not a forum in which to litigate claims against or air grievances about the government. That can be done in a civil lawsuit. Defendant is most certainly aware of this: he, his family, and his friends have filed multiple civil lawsuits, in which the complainants are represented by defense counsel in this case or an associated attorney. All of these lawsuits have been dismissed. *See Ferguson et al. v. Labno et al.*, 20 CV 6487 (N.D. Ill.) (claims against Agent Labno dismissed on March 17, 2022, case dismissed on April 13, 2022); *Ferguson et al. v. Labno et al.,* 20 CV 1917 (N.D. Ill.) (case dismissed on August 4, 2022); *Millwood v. Labno*, 22 CV 212 (N.D. In.) (claims against Agent Labno dismissed on September 13, 2023). Defendant now seeks to use his own criminal sentencing to continue raising allegations against the government. This Court should not permit him to abuse the criminal judicial process in this way.

### A.   Imperfect Sentencing Entrapment

The government maintains its position, articulated in its response to defendant's sentencing memorandum, Dkt. No. 328, incorporated by reference here, that there was no entrapment at any point in this case.

Defendant claims that the UCs obtained the firearms purchased on November 9, 2015 "in exchange for North Face jackets," and that defendant "wanted to pay for the North Face jackets in cash," not guns. Dkt. 325 at 5. Defendant alleges that it was the UC (Agent Labno) "who "suggest[ed] making cocaine a part of the transactions," and that defendant displayed "reticence to be involved in dealing with

cocaine." Dkt. 325 at 9-10. Defendant repeatedly claims that "[t]he involvement of drugs as payment for the sale of goods was … *not ever* offered by Mr. Ferguson of his own volition." Dkt. 325 at 5 (emphasis added); *see also id.* at 11 ("When acting on his own, Mr. Ferguson *never* pursued the use of cocaine to purchase goods.") (emphasis added); *id.* ("If it [were] up to [defendant] on his own, cocaine should *never* be involved") (emphasis added). Defendant also claims—without evidence—that Agent Labno participated in an undocumented, unrecorded exchange of merchandise for cash sometime before the November 9, 2015 firearm sale. Dkt. 325 at 5

"Sentencing entrapment occurs 'when the government causes a defendant initially predisposed to commit a lesser crime to commit a more serious offense.'" *United States v. Gutierrez-Herrera*, 293 F.3d 373, 377 (7th Cir. 2002) (quoting *United States v. Estrada,* 256 F.3d 466, 473-74 (7th Cir. 2001)). "[A] defendant must pass a high bar" to establish the defense. *United States v. Turner*, 569 F.3d 637, 641 (7th Cir. 2009). He must show both: "(1) that he lacked a predisposition to commit the crime, and (2) that his will was overcome by 'unrelenting government persistence.'" *Id.* (quoting *Gutierrez–Herrera,* 293 F.3d at 377). Conversely, defeating a sentencing entrapment claim "is not a great hurdle." *United States v. Hale*, 448 F.3d 971, 989 (7th Cir. 2006). "[T]he government need not explain or defend its motives, but must show only that the defendant was in fact predisposed to violate the law without 'extraordinary inducements.'" *United States v. White*, 519

F.3d 342, 347 (7th Cir. 2008) (quoting *United States v. Veazey,* 491 F.3d 700, 710 (7th Cir. 2007)).

Defendant has acknowledged before this Court that he does not seek to prove sentencing entrapment but rather to argue imperfect entrapment in mitigation under 3553(a). Because of defendant's allegations, the government anticipates calling witnesses at sentencing who will present evidence that defendant was predisposed to distribute cocaine and to sell the guns. The government has also agreed to make Special Agent Labno available to defendant for testimony that relates to defendant's imperfect entrapment argument. The government does not intend to call Special Agent Labno to testify because his testimony is not necessary to respond to defendant's imperfect entrapment arguments.

The government will call Special Agent Christopher Burney, the primary case agent, who will testify regarding various topics that relate to predisposition. For example, Agent Burney will testify that defendant, not law enforcement, initiated the November 2015 sale of the guns to the UCs. Furthermore, contrary to defendant's claim that he wanted to buy the UCs' North Face merchandise with cash and not guns, it was the defendant who received cash--$10,000 of it--along with a modest quantity of merchandise, in exchange for the stolen firearms defendant had been trying to sell since October 2015.

With respect to defendant's claims that agents entrapped him into selling cocaine, Agent Burney will also testify regarding defendant's prior conviction for

manufacture/delivery of cocaine. PSR ¶86; *see United States v. Blitch*, 773 F.3d 837, 845 (7th Cir. 2014) ("Prior convictions for similar offenses are 'relevant but not conclusive evidence of predisposition …. (quoting *United States v. Mayfield,* 771 F.3d 417, 420 (7th Cir. 2014) (*en banc*))); *see also Turner*, 569 F.3d at 642 (affirming rejection of sentencing entrapment defense where the defendant "ha[d] a history of selling crack"). Agent Burney will testify regarding defendant's attempted sale of cocaine to CS-2 in January 2016—prior to any cocaine transactions with the UCs. Agent Burney will also highlight the quantity of cocaine transactions in this case and defendant's recorded behavior and statements during cocaine transactions with UCs, which indicated that he was a willing participant and had been in the cocaine dealing business for a significant amount of time prior to the first UC cocaine transaction. This evidence includes but is not limited to defendant's admitted use of a sophisticated triple-beam scale to weigh the cocaine, his references to his long-time cocaine supplier (his "regular connect"), his comfort in engaging in cocaine negotiations with the UCs, his unprompted offers to provide the UCs with more cocaine, his use of various tactics to mitigate the risks of and conceal the cocaine transactions, his sales of cocaine to other customers, namely, CS-2, for cash and not merchandise, and his advice to CS-2 regarding how to maximize profit in cocaine sales. *See White*, 519 F.3d at 347 (citing number of narcotics sales as evidence of predisposition towards drug distribution and rejecting sentencing entrapment defense where the defendant sold drugs "to various customers"); *Gutierrez-Herrera*,

293 F.3d at 377 (willing participant as evidence of predisposition); *United States v. Wilson*, 129 F.3d 949, 950-51 (7th Cir. 1997) (defendant was "in a position to become involved in the purchase of drugs," *see Estrada*, 256 F.3d at 476, and the UC "did not provide the means to commit a crime that [he] otherwise could not have committed."); *see also Estrada*, 256 F.3d at 476 (stating that, for the purposes of sentencing entrapment, "[i]t is different when the defendant is not in a position without the government's help to become involved in illegal activity" (quoting *United States v. Hollingsworth,* 27 F.3d 1196, 1200 (7th Cir. 1994) (en banc))).

For example, as described above and in the government's prior filing, Dkt. No. 328, during the May 3, 2016 cocaine transaction, when the baggies of cocaine did not weigh enough, defendant offered to provide the UCs with an extra quarter ounce, then suggested that he provide an additional full ounce instead so that he wouldn't have to break up the cocaine he had, with the UC covering the cost of the additional three quarters of an ounce. As another example, when the UC asked defendant if he could get half a kilogram of cocaine at the next transaction, defendant immediately agreed "without even the slight pause," *see United States v. Williams*, 1996 WL 514851, *2 (7th Cir. Sep. 9, 1996), stating, "Anything you want." In addition, during the May 19, 2016 transaction, while waiting for defendant's supplier to deliver 9 additional ounces of cocaine, the UCs repeatedly suggested delaying or canceling the entire transaction, but defendant refused and asked the UCs to do him a favor by continuing to wait for the cocaine. As another example, after the December 15, 2016

transaction in which defendant sold the UCs 391.6 grams of cocaine in exchange for 500 cartons of cigarettes, *defendant* sent a text message to Agent Labno and asked whether Agent Labno could conduct similar transactions "once a week."

Through Special Agent Burney, the government will also present evidence to refute defendant's claims that ATF had dealings with defendant prior to the November 9, 2015 gun transaction. This evidence includes records showing that ATF identified defendant and ran him through their database only after the gun transaction, records showing that defendant's telephone number was not put in the UC's telephone until May 19, 2016, and records showing that defendant's first telephonic contact with Agent Labno was on May 19, 2016. Exh. A; Exh. H; Exh. I. Agent Burney will highlight areas of recordings that indicate that November 9, 2015 was the first time that agents met Dominguez and May 3, 2016 was the first time agents dealt with defendant. For example, before defendant arrived on May 3, 2016, Dominguez told Agent Labno, "He's cool, bro," and later said, "You met him before. The day we did them things." Agent Labno responded, "With the pistols?" Dominguez replied, "Yeah, the white guy." Dominguez's comments are inconsistent with defendant's allegation that he had transactions with Agent Labno that predated the November 9 firearm sale; defendant's theory is not only unsupported, but directly contradicted by the record.

Agent Burney will also address defendant's claim that certain recorded calls suggest that a transaction between Agent Labno and defendant preceded the gun

transaction. Defendant points to a recorded telephone call between the UC and Dominguez at approximately 9:07 p.m. on November 8, 2015, during which Dominguez asked whether Agent Labno "had any of those NFL jerseys that you were telling me about." Agent Labno responded, "Yeah, I got NFL jerseys." Dominguez replied, "Oh, ok, yeah, because people are asking me about them." Agent Labno stated, "Yeah, I'll look and see what I got."[3] Defendant argues that this exchange somehow proves the existence of a prior unrecorded transaction. In reality, Dominguez was referencing his earlier phone calls with Agent Labno on November 7 and November 8, all of which are documented or recorded. In multiple calls during that period, Agent Labno and Dominguez discussed various items of stolen merchandise that Agent Labno or Dominguez either had in their possession or could obtain. During those conversations, the two alluded to "'knock-off' clothing as well as stolen clothing *and apparel* (emphasis added)."

Agent Burney will address another call cited by defendant from November 9, 2015, in which Dominguez told Agent Labno that defendant was "bugging the shit out of [him]" about North Face jackets. Dkt. 325 at 7. In defendant's view, if Agent Labno did not sell the first set of North Face jackets until later that night during the controlled firearm sale, "then how could it be the case that Ferguson could have been 'bugging the shit' out of Dominguez?" Dkt. 325 at 7. The answer is plain; Agent Labno

---

[3] Defendant wrongly claims that Agent Labno told Dominguez that Agent Labno would investigate whether there were any "more" jerseys. Dkt. 325 at 6. The word "more" does not appear in recorded call itself, nor in the description of the call in the corresponding report.

and Dominguez had already been discussing the exchange of guns for jackets for two days. On the morning of November 7, Agent Labno and Dominguez discussed various items of stolen merchandise—including North Face gear. Later that day, Dominguez told Agent Labno that he had told his "partner [defendant] … about all the stuff you got," and that defendant was "interested" in visiting Agent Labno to "check out what you got." On the afternoon of November 9, Dominguez similarly told Agent Labno that his "buddy [defendant] … wants to see the quality of the North Faces that you got." If, as defendant alleges, Agent Labno and defendant had already consummated an undocumented, unrecorded transaction, it makes little sense that defendant would have wanted to examine the same type of merchandise he had already supposedly purchased.

The government may also call codefendant Jesus Dominguez, who would testify regarding defendant's years of selling of cocaine prior to his transactions with the UCs in 2016, both to Dominguez personally (an undisputed fact included in the PSR as described above), as well as to other cocaine customers. Dominguez would also testify that defendant, not law enforcement, initiated the unlawful sale of 23 firearms to the UCs. Dominguez would also testify regarding the timing of defendant's contacts with Agent Labno and, if needed, explain the substance of his own conversations with Agent Labno.

The government may also call Jesse Guajardo, a former member of the Latin Kings street gang, who would testify that he met defendant in approximately 2001,

24

and at defendant's request, he granted defendant permission to sell cocaine in Latin Kings's territory (Nottingham Park—the location of the cocaine transactions in this case). Guajardo would further testify that, between 2001 and 2006, he and his associates sold defendant kilogram quantities of cocaine for defendant to further distribute.

### B. MIL 1: Motion to exclude testimony and argument that agents intimidated defendant's family and friends

#### 1. Timothy Ferguson

Defendant plans to call his son Timothy Ferguson at sentencing. Dkt. No. 441. Defendant alleges that Agent Labno told Timothy he would lose his kids if he did not give consent to search the garage of the house where he was staying. Dkt. No. 325 at 17, Dkt. No. 445 at 6. This is false.

As described more fully above, agents conducted a consent search of the garage of the house where Timothy Ferguson was staying on October 30, 2018, after defendant was charged in this case. Exh. E (ROI 166). Agents approached Timothy at approximately 6:15 a.m. that day and obtained consent to search at approximately 6:20 a.m. *Id*. Agent Labno *was not even present*. At the time Timothy's garage was searched, Agent Labno was over 10 miles away executing a search warrant and interviewing defendant at defendant's house in Willowbrook, as the defendant acknowledges. Dkt. 325 at 14-15, Exh. D (ROI 172). Neither Agent Labno nor any other agent threatened or intimidated Timothy.

In addition to being false, defendant's claims that Agent Labno intimidated Timothy are wholly irrelevant. As described more fully above, the search did not yield anything material to defendant. Defendant has confirmed that the consent search of the garage is the substance of Timothy's anticipated testimony.[4] Dkt. No. 456. Timothy Ferguson's testimony is not relevant to the 3553(a) factors, nor is it relevant to defendant's imperfect entrapment argument, and any testimony and argument on this topic should be excluded.

## 2. Trace and Trent Ferguson

Defendant intends to call his sons Trace and Trent Ferguson as witnesses. Dkt. No. 441. The government has no information about any relevant testimony they would be competent to provide. They were both physically present during the execution of the search warrant at defendant's house on October 30, 2018. The government does not intend to use any evidence obtained during the execution of this search warrant at sentencing, and neither the search nor any evidence from it are mentioned in the PSR or Updated PSR. Testimony and argument about alleged law enforcement misconduct in the course of the search of defendant's house, which occurred after defendant was charged in this case, is not relevant to the 3553(a)

---

[4] Specifically, defendant wrote, "the idea that the subject matter of these witnesses' [Timothy Ferguson and John Deir] testimony is somehow unknown is ridiculous" and went on to cite to his prior filings, in which he makes the allegations that the government describes here. Dkt. No. 456 at 1.

factors, nor is it relevant to defendant's imperfect entrapment argument; therefore, it should be excluded.

### 3.    Debbie Millwood

Defendant plans to call his niece Debbie Millwood at sentencing. Dkt. No. 441. He alleges that Agent Labno and another agent caused Millwood to believe that her children could be taken away from her if she did not incriminate defendant. Dkt. No. 325 at 16, Dkt. No. 445 at 8-9.  This is false.

As described more fully above, agents, along with representatives from DCS, interviewed Millwood on November 15, 2018, weeks after defendant was charged. Exh. F (ROI 174).  The purpose of the portion of the interview for which agents were present was to conduct a victim interview and inform Millwood that they had obtained evidence that defendant was stealing money from her—money that she was supposed to be receiving as part of a settlement. *Id.*  Millwood did not provide any information about defendant's narcotics or firearms activities. *Id.*

At no point did any agent threaten to take Millwood's children. *Id.*  Moreover, the allegations defendant raises in connection with Millwood occurred after defendant was charged in this case and are not relevant to the 3553(a) factors, nor are they relevant to defendant's imperfect entrapment argument, and any testimony and argument on this topic should be excluded.[5]

---

[5] Millwood sued Agent Labno and others, making similar allegations. *Millwood v. Labno, et. al,* 22 CV 212 (N.D. In.).  All claims against Agent Labno were dismissed.

### 4. John Deir

Defendant plans to call his friend John Deir at sentencing. Dkt. No. 441. Defendant alleges that Agent Labno had Deir arrested without a warrant and promised him he would be released "scot-free" if he incriminated defendant. Dkt. No. 325 at 17. This is false.

As described more fully above, Deir was charged along with defendant with obstruction of a court order by threatening a witness, Individual A. 18 CR 858. Deir was arrested on December 17, 2018 pursuant to an arrest warrant issued on December 13, 2018. 18 CR 858, Dkt. No. 6. Deir pled guilty and was sentenced in April 2019. 18 CR 858 Dkt. Nos. 148, 149. Agents did not know of Deir prior to his intimidation of Individual A.

As described more fully above, when agents arrested Deir on December 17, 2018, they also obtained a search warrant for his house, where they found guns, ammunition, drug paraphernalia, and cash. Exh. G (ROI 185). Subsequently, Deir was charged with gun-related charges in Cook County. After he was arrested on those charges in 2020, agents attempted to interview Deir but terminated the interview when he requested counsel. Deir did not make any statements.

No agent ever intimidated Deir, and Deir did not incriminate the defendant. The search of Deir's house did not yield anything material to sentencing. The government therefore does not intend to use any of the items found at Deir's house or any statements made by Deir at defendant's sentencing, and the PSR and Updated

PSR do not mention Deir. Defendant has confirmed that Deir's arrest and the search of his house constitute the scope of Deir's anticipated testimony. Dkt. No. 456. All of the allegations defendant raises in connection with Deir occurred months after defendant was charged in this case and are not relevant to the 3553(a) factors, nor are they relevant to defendant's imperfect entrapment argument, and any testimony and argument on this topic should be excluded.

### 5. ATF Special Agents Christopher Labno and Christopher Burney[6]

Defendant should be precluded from calling law enforcement officers solely for the purpose of testifying about the irrelevant allegations described herein. In addition, 28 C.F.R. §§ 16.21 et seq., commonly referred to as the *Touhy* regulations, named after *United States ex rel. Touhy v. Ragen*, 340 U.S. 462 (1951), provide that no present or former employee of the Department of Justice may testify in response to a subpoena without obtaining prior approval by an appropriate Department official. Defendant must seek approval and include a relevancy statement. 28 C.F.R § 16.22(c). See Justice Manual §1-6.000, DOJ Personnel as Witnesses, available at https://www.justice.gov/jm/jm-1-6000-dojpersonnel-witnesses (last visited Aug. 6, 2023). Defendant has not served a subpoena on any law enforcement officer, much less complied with *Touhy* regulations requiring a relevancy statement. Unless and

---

[6] Defendant also lists "S.A. Eric Kowalski" on his witness list, but the government is unaware of a law enforcement officer by this name. Defendant may mean Special Agent Eric Koslowski, in which case the government makes the same arguments against calling Agent Koslowski as it does with respect to the other agents.

until he does, he should be precluded from calling any law enforcement officer other than Agent Labno, whom the government has agreed to make available for testimony concerning defendant's imperfect entrapment argument, for any purpose at sentencing.

### C. MIL 2: Motion to exclude testimony and argument that defendant was wrongfully prosecuted for obstructing a court order

Defendant, not law enforcement, is the one who intimidated a witness in connection with this case. Defendant pled guilty to obstructing a court order by intimidating Individual A. 18 CR 858, Dkt. No.156. Now, defendant lists Individual A, the victim in that case, on his witness list. Dkt. No. 441. Defendant argues that not only did he do nothing wrong but he was actively seeking to protect the victim. Dkt. No. 325 at 17. He seeks to relitigate a matter to which he has already pled guilty under oath—a plea which he has not moved to withdraw or otherwise contested. 18 CR 858, Dkt. No. 156. "A plea of guilty is a 'grave and solemn act.'" *United States v. Loutos*, 383 F.3d 615, 619 (7th Cir. 2004) (quoting *United States v. Ellison*, 798 F.2d 1102, 1106 (7th Cir. 1986)). "Entry of a plea of guilty is not some empty ceremony, and statements made to a federal judge in open court are not trifles that defendants may elect to disregard." *United States v. Stewart*, 198 F.3d 984, 987 (7th Cir. 1999). Defendant's written plea agreement, cited more fully above, provides:

> On November 17, 2018, … [d]efendant approached Individual A and, in summary, repeatedly threatened that Individual A would get in trouble if he responded to the subpoena. Defendant falsely told Individual A that he had seen two indictments for tax evasion against Individual A and that Individual

A would go to jail if he went to court. Defendant told Individual A to stop speaking with law enforcement, and that he would only get into more trouble if he continued to cooperate.

Defendant admits that he engaged in the above-described conduct in order to prevent Individual A's compliance with the subpoena, which he knew to be unlawful.

18 CR 858, Dkt. 156 at 3. As he has not yet been sentenced in case 18 CR 858, that case does not affect defendant's Sentencing Guidelines range here.

Defendant has not disclosed any purpose for calling Individual A to testify. Defendant should not be permitted to call his victim in an attempt to contradict facts that he himself admitted in a sworn plea agreement—particularly not at a sentencing hearing for conduct that defendant engaged in occurred prior to his intimidation of Individual A. The testimony of Individual A is not relevant to the 3553(a) factors, nor is it relevant to defendant's imperfect entrapment argument, and it should be excluded.

### D. MIL 3: Motion to exclude testimony and argument that an agent engaged in misconduct in an unrelated case

Defendant intends to call Adam Delgado as a witness. Dkt. No. 441. Delgado filed a 2015 whistleblower lawsuit filed in which he "suspected" that Special Agent Labno committed perjury, *see Delgado v. Lynch et al.*, case no. 15 CV 3976 (ND Ill.) (case dismissed on June 24, 2015); *Delgado v. United States Dep't of Just.*, 979 F.3d 550, 557 (7th Cir. 2020). Nothing about that case pertained to defendant. Instead, it involved a robbery case in which Special Agent Labno testified.

Moreover, despite nearly seven years of litigation, no court or administrative body has ever substantiated Delgado's claims against Special Agent Labno or found that Special Agent Labno was not credible during his testimony in the case. To the contrary, in *United States v. Timothy Hilliard*, 19 C 7387, 2021 WL 105805, at *5-6 (N.D. Ill. Jan. 21, 2021), Judge Leinenweber, citing *United States v. Wilson*, 2008 WL 5207276 (7th Cir. Dec. 12, 2008) and *United States v. Saunders*, 166 F.3d 907 (7th Cir. 1999), found that the allegations against Special Agent Labno were unsubstantiated, and therefore the "minimal probative value that evidence of Delgado's complaint might have is substantially outweighed by the potential prejudice." *Hilliard*, 2021 WL 105805, at *9. As a result, the court held that Special Agent Delgado's allegations would have been inadmissible at trial.

Testimony and argument about agents' conduct in unrelated cases is not relevant to the 3553(a) factors, nor is it relevant to defendant's imperfect entrapment argument. Defendant should be precluded from calling Adam Delgado to testify regarding Special Agent Labno, and any other testimony or argument regarding agents' conduct in unrelated cases should likewise be excluded.

### E.   MIL 4: Motion to exclude testimony and argument that agents violated defendant's Fifth and Sixth Amendment rights during the October 30, 2018 search of his house and interview of defendant

Defendant seeks to relitigate the search of his house and his questioning by law enforcement in October 2018, all of which occurred after he was charged in this case. Dkt. 325 at 14. This has no relevance to the factors set forth in 18 U.S.C. §

3553(a). None of the facts outlined in defendant's plea agreement, the PSR, the Updated PSR, or the Government's Sentencing Memorandum include or derive from *any* evidence obtained from defendant's home or interview.

In addition, this Court previously denied defendant's motion to suppress evidence obtained from his home, and defendant opted not to contest his statements to police. Finally, even if the government *did* cite such evidence, and further assuming, *arguendo*, that constitutional violations *did* occur, the Seventh Circuit has long held that "evidence which might be inadmissible at the guilt phase of a trial can be admitted at the sentencing phase, as long as the evidence is reliable." *Del Vecchio v. Illinois Dep't of Corr.*, 31 F.3d 1363, 1388 (7th Cir. 1994) (en banc); *see also id.* ("[E]ven if we were to accept [the defendant's] contention that [his] confession was taken in violation of *Miranda*, that violation would not require exclusion of the confession during the sentencing proceedings."); *United States v. Brimah*, 214 F.3d 854, 859 (7th Cir. 2000) ("[T]he exclusionary rule does not bar the consideration at sentencing of evidence seized in violation of the Fourth Amendment."). This rule is based upon the Court's determination that "reaching an appropriate decision in sentencing outweighs what little deterrent effect may be present" through application of the exclusionary rule. *Brimah*, 214 F.3d at 858-59 (quoting *United States v. Torres*, 926 F.2d 321, 325 (3d Cir. 1991)).

Defendant should not be permitted to present testimony or argument on this topic.

33

Defendant also appears to seek to re-raise these issues for the mere purpose of attempting to impeach the credibility of Special Agent Labno. During the course of the suppression litigation in this case, this Court made no credibility findings with respect to Special Agent Labno. The findings that the Court did make were made without any testimony, and the Court did not find that Special Agent Labno was untruthful in his report.

The government does not seek to revisit this Court's ruling concerning the motion to suppress but wants to fully describe for the Court why defendant's persistent focus on the search is misplaced and should not be entertained at sentencing. As shown below, defendant's wife made several trips upstairs on October 30, 2018, the first of which occurred at 7:16 a.m. (the parties agree that the time stamp on the surveillance footage is one hour behind the actual time), during which she preceded a single agent. She then entered the bedroom, followed by the agent, and handed the agent a phone:





This is consistent with the report, which states that an agent told defendant's wife that agents had a warrant to search the defendant's phone, that the defendant said the phone was in the bedroom, and that the agent then followed defendant's wife

35

upstairs as she pointed out where the telephone was. Exh. D (ROI 172). Moments later, defendant's wife was seen speaking with two agents at the top of the stairs before returning downstairs:



Almost two hours later, at 9:03 a.m., defendant's wife returned to the bedroom by herself, which demonstrates that she was free to move around the residence:

36



Approximately forty minutes later, at 9:43 a.m., defendant's wife returned to the bedroom—this time with one agent in front and one agent behind her:



It is this last trip upstairs that appears to align with the description of events during argument regarding defendant's motion to suppress. But this last trip was more than two hours after the events described in Special Agent Labno's report, which were consistent with what was shown on the recording.

Defendant further claims that Special Agent Labno interfered with his right to counsel by asking defendant about possible criminal conduct of defense counsel during his post-arrest interview. Dkt. No. 325 at 14-15, Dkt. No. 445 at 7. Defendant does not claim that he invoked his right to remain silent or that he asked for counsel, nor does he claim that he was aware of this investigation prior to his arrest. There was no indication that defendant was represented by defense counsel with respect to this investigation at the time. In fact, agents advised defendant of his rights, including his right to counsel prior to questioning him, and defendant waived those rights. Exh. D (ROI 172).

Moreover, the defendant mischaracterizes how he responded to the agents' inquiry about his counsel. He claims that he told agents that he does not know of his attorney doing anything illegal. Dkt. No. 445 at 7. In fact, agents asked the defendant whether he would be willing to cooperate with law enforcement. Exh. D (ROI 172). The defendant indicated that he would cooperate but wanted to know what benefits he would receive in exchange for his cooperation. *Id.* Agents asked about various individuals and actions that defendant may be willing to perform, such as conducting a controlled purchase of narcotics. *Id.* One of the individuals agents asked about was

38

defense counsel. *Id.* When asked whether he had defense counsel "dead to rights" on criminal conduct, the defendant replied, "I believe I do." *Id.*

Law enforcement officers asking a recently arrested individual whether he would cooperate against others believed to be committing unlawful acts based on information obtained during a criminal investigation is standard procedure, and law enforcement's efforts to investigate a person other than defendant, namely, defense counsel, are not relevant to the 3553(a) factors, nor are they relevant to defendant's imperfect entrapment argument.

For these reasons, the government moves this Court to exclude testimony and argument regarding alleged agent misconduct during the October 30, 2018 search of defendant's residence and interview of defendant.

### F.    MIL 5: Motion to exclude testimony and argument regarding agents' involvement in prosecutions against defendant in Kenosha, Wisconsin, and Will County, Illinois

Defendant seeks to present testimony and argument regarding his pending stolen goods state court case in Kenosha, Wisconsin, described more fully above. Dkt. No. 325 at 15-16. *See* Case. No. 2018CF001271, Kenosha County Circuit Court. Defendant alleges, with no evidence, that agents provided false information to the state's attorney that resulted in defendant having to post a bond, and that witnesses lied in connection with the Wisconsin charges. Dkt. No. 325 at 15-16; Dkt. No. 445 at

3. Defendant's claims are false.[7]  In any event, the conditions of defendant's bond and the proceedings in Wisconsin are irrelevant to the 3553(a) factors and defendant's imperfect entrapment argument, and he should be precluded from introducing testimony or argument on these topics.

Similarly, defendant seeks to present testimony and argument regarding his pending stolen goods state court case in Will County, Illinois, described more fully above. Dkt. No. 325 at 18. *See* Case. No. 21 CF 718.  Defendant alleges that agents "circumvented the U.S. Attorney's Office" to present a case to the Illinois AG's Office. *Id.*  This is false.[8]  In any event, the process by which another prosecutorial entity elected to prosecute crimes is not relevant to the 3553(a) factors, nor is it relevant to defendant's imperfect entrapment argument, and defendant should be precluded from introducing testimony or argument on this topic, including the testimony of former AUSA Matthew Kutcher.

### G. MIL 6: Motion to exclude testimony and argument that agents, particularly Agent Labno, engaged in various other misconduct

Throughout this case, defendant has made false and wholly unsubstantiated allegations against law enforcement, in particular Supervisory Special Agent Labno.

---

[7] As set forth above, in defendant's most recent plea agreement, he stipulated to having committed the crimes with which he is charged in Kenosha. Dkt. No. 424. Thus, it is possible that defendant will not seek to pursue this argument at sentencing.

[8] Again, as set forth above, in defendant's most recent plea agreement, he stipulated to having committed the crimes with which he is charged in Will County. Dkt. No. 424. Thus, it is possible that defendant will not seek to pursue this argument at sentencing.

Defendant's escalating false allegations against Agent Labno evidence an effort to shift the Court's attention from his own conduct to Agent Labno.

Defendant should not be permitted to present testimony or argument based on unsupported allegations. For example, in his most recent filing, defendant went so far as to allege that Agent Labno smoked crack with codefendant Jesus Dominguez. Dkt. 445 at 3. This allegation is made with no supporting evidence. Defendant alleges that Special Agent Labno "manufactured a drug crime," and defendant was the victim. *Id.* at 2. In that same filing, for the first time, defendant alleges that Special Agent Labno not only violated defendant's rights by disregarding his request for counsel during an interview, but he did so to everyone else, too, including Debbie Millwood, to whom defendant claims Agent Labno said, "tell me your lawyer is not that piece of shit, Beau Brindley," and John Deir, to whom defendant claims Agent Labno said, "Give me anything on Ferguson. I do not care what. Just give it to me and you walk out," followed by "pejorative and inflammatory remarks about Mr. Ferguson and [Brindley]." *Id.* at 7, 9, 12.

Defendant summarized what he wants to make his sentencing about:

In the pursuit of Mr. Ferguson, Agent Labno has conducted illegal searches, engaged in acts of coercive threat and intimidation, interfered with attorney/client relationships, violated constitutional rights, provided false information to prosecutors, provided false information in agent reports, victimized a psychologically damaged young woman, and plainly stated his personal vendetta against Terry Ferguson.

*Id.* at 12. Not a single one of defendant's allegations against Special Agent Labno is true, nor is any allegation supported by any evidence. Regardless, these claims have

no relevance to what sentence defendant should receive. To allow defendant to use his own sentencing to air his grievances against Agent Labno would allow defendant to abuse the criminal justice system. He should be precluded from doing so.

## H.    MIL 7: Motion to exclude the testimony of AUSA Paul Mower

Defendant intends to call AUSA Paul Mower as a witness. Dkt. No. 441. AUSA Mower began work on this case in February 2019. Dkt. No. 63.  He did not participate in the underlying investigation.   Defendant has not provided the government with any information regarding AUSA Mower's anticipated testimony, and the government is not aware of any purpose for calling AUSA Mower to testify.

Even if AUSA Mower were to somehow possess information relevant to sentencing in this case, under the advocate-witness rule, AUSA Mower is barred from "acting as both an advocate and a witness in a single proceeding" except under special circumstances. *United States v. Watson*, 87 F.3d 927, 932 (7th Cir. 1996); *Petrilli v. Drechsel*, 94 F.3d 325, 330 (7th Cir. 1996).  AUSA Mower is a prosecutor and member of the prosecution team in this case; accordingly, he may not properly testify regarding events in which he participated.

It is well recognized that the advocate-witness rule "is grounded in important and legitimate concerns with respect to the proper functioning of the adversary system." *United States v. Bin Laden*, 91 F. Supp. 2d 600, 623 (S.D.N.Y. 2000).  Courts have also recognized that offensive use of the rule may actually "distort[] the adversary process." *Id.*  For this reason, "[a] defendant who wishes to call a prosecutor

as a witness must demonstrate a compelling and legitimate reason to do so." *United States v. Regan*, 103 F.3d 1072, 1083 (2d Cir. 1997). In other words, a party seeking the testimony of a prosecutor "must demonstrate that the evidence is vital to his case, and that his inability to present the same or similar facts from another source creates a compelling need for the testimony." *United States v. Watson*, 952 F.2d 982, 986 (8th Cir. 1991).

In addition, defendant's examination of AUSA Mower could easily stray into areas protected by the attorney-client, attorney work product, and deliberate process privileges. *See, e.g., United States v. Zingsheim*, 384 F.3d 867, 871-72 (7th Cir. 2004) (noting that the attorney-client privilege covers conversations between prosecutors and client agencies within the government, that the work-product privilege applies to discussions between prosecutors and investigating agents, and that the deliberative-process privilege covers memoranda and discussions within the Executive Branch leading up to the formulation of an official position) (citations omitted).

The government is unsure whether defendant actually intends to call AUSA Mower to testify; he has not served a subpoena on AUSA Mower or attempted to comply with *Touhy* regulations. Nevertheless, the government moves to preclude AUSA Mower's testimony in its entirety, both on the bases described above and on the basis of defendant's failure to comply with *Touhy*.

43

I.    **MIL 8: Motion to exclude argument in mitigation based on defendant's purported medical conditions**

In his updated sentencing memorandum, defendant claims that he suffered a heart attack and underwent surgery. Dkt. No. 431 at 1. Defendant argues that this, in addition to defendant's gallbladder surgery, should be considered by this Court in mitigation. *Id.* at 2.

At the parties' June 1, 2023 status hearing, the government informed the Court that one month prior, by email, it requested from defendant "any documentation regarding the gall bladder surgery and the heart attack/resulting surgery, and any other medical conditions that you plan to argue under 3553(a), as soon as possible," "including the facility and doctor's names" but did not receive a response. The Court authorized the early return of subpoenas and instructed defendant to provide this information to the government. The government did not receive any such information from defendant.

On June 26, 2023, the government sent an email to defense counsel renewing its request "for any documentation regarding the gall bladder surgery, the heart attack/resulting surgery, and any other medical issues that you plan to cite in mitigation at sentencing, including the facility and doctor's names." The government did not receive a response.

On August 4, 2023, the government sent another email requesting information, asking, "At a minimum, please identify the relevant heath care providers." The government did not receive a response.

On September 17, 2023, the government sent another email requesting the same information. The government has not received a response.

Defendant has therefore refused to provide information regarding his argument in mitigation for the past five months, despite repeated inquiries and an instruction from the Court, in effect preventing the government from attempting to verify defendant's claims. Given the repeated dubious assertions by defendant regarding medical conditions in this case, about which this Court is undoubtedly aware, the Court should exclude argument in mitigation based on unsubstantiated medical conditions.

## CONCLUSION

Defendant seeks to make his sentencing hearing about anything other than his own conduct. He should be precluded from doing so. For the foregoing reasons, the government respectfully requests that the Court grant the government's motions *in limine* set forth above.

Respectfully submitted,

MORRIS PASQUAL
Acting United States Attorney

By: *Misty N. Wright*
MISTY N. WRIGHT
Assistant United States Attorney
219 South Dearborn Street, 5th Floor
Chicago, Illinois 60604
(312) 353-5300